The LINCOLN NATIONAL LIFE
INSURANCE COMPANY

v.

The UNITED STATES.

No. 521–69.

United States Court of Claims.

July 14, 1978.

Edward J. Schmuck, Washington, D. C., attorney of record, for plaintiff. Francis M. Gregory, Jr., Carolyn P. Chiechi, Leonard B. Terr and Sutherland, Asbill & Brennan, Washington, D. C., of counsel.

Herbert Grossman, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr. and Donald H. Olson, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and BENNETT, Judges.

## OPINION

PER CURIAM.

This is the last phase of the liability determination portion of an action brought for the recovery of overpayment of federal income taxes and assessed interest thereon for each of the years 1958 through 1965, together with interest thereon as provided by law. Originally, the case involved numerous issues, but all except the six before the court today have previously been settled or resolved.

The six issues before us today were tried by the parties and, on November 12, 1976, Trial Judge Lloyd Fletcher filed his findings, opinion, and recommended conclusions of law holding that plaintiff was entitled to recovery on four of the issues and against the plaintiff on two of the issues. Both parties duly filed notices of intention to except under Rule 141. In addition, since the filing of the trial judge's opinion, the Supreme Court in *Commissioner of Internal Revenue v. Standard Life & Accident Insurance Co.*, 433 U.S. 148, 97 S.Ct. 2523, 53

L.Ed.2d 653 (1977), has settled a conflict between the circuits over the correct tax accounting treatment to be given deferred and uncollected premiums.

Briefing by the parties of the deferred and uncollected premiums issue was suspended by this court pending the Supreme Court decision in *Standard Life*. Subsequent to that Court decision, the parties have completed briefing in the case and submitted the case to the court after oral arguments were presented. Since the court agrees with the trial judge's findings, opinion, and recommended conclusions of law, with modifications with respect to the correct tax accounting treatment to be given the deferred and uncollected premiums item, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth.* The modification which the court makes merely applies the holding of the Supreme Court in *Standard Life*, that only the net valuation portion of the deferred and uncollected premiums, not the gross premiums, must be included in assets and gross premium income as well as in reserves, to the facts of this case.

 In making this modification, we note that defendant, in its final supplemental brief in the case and at oral argument, urged this court to consider whether plaintiff had waived its right to ·claim the benefit of the ultimate decision in *Standard Life*, because plaintiff altered its legal position before the trial judge to the position that, although it had to include the full gross premiums in assets and income as well as reserves, it was entitled to a deduction for the cost of collecting those premiums. We hold that plaintiff did not make such a waiver nor that plaintiff is estopped from claiming the benefit of the ultimate decision in *Standard Life* because it adopted a different legal position before the trial judge. For there to be a waiver of a right, a party must have known what rights it had. *See generally Brady v. United States,*

397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Plaintiff can hardly be charged with knowledge of what its rights were in regard to the correct treatment to be given the deferred and uncollected premiums in view of the various positions taken by the courts on the subject. *See Commissioner of Internal Revenue v. Standard Life & Accident Insurance Co., supra,* 433 U.S. at 159–162, 97 S.Ct. 2523. Further, for this court to hold that plaintiff waived its rights to claim the benefit of the ultimate holding in *Standard Life* would, in effect, be punishing the plaintiff for adopting, at the time of trial, what appeared to be a reasonable legal position under the then existing legal climate of opinion. This would cause future plaintiffs to avoid adopting what seems to be a reasonable position at trial for fear of being subsequently charged with a waiver of their rights; thus, exacerbating the conflict between taxpayers and the Internal Revenue Service rather than encouraging a climate conducive to settlement. This court refuses to adopt such a position which would have the tendency to exacerbate conflicts. Nor is plaintiff estopped from claiming the benefit of the ultimate decision in *Standard Life*. For there to be an estoppel, the defendant must be prejudiced in some way. We can find no prejudice to the defendant in this case. Defendant still tried its alternative contention, that the deferred and uncollected premiums should be entirely ignored in calculating plaintiff's reserves, assets, and gross premium income, and the trial judge rejected it in his opinion. Defendant now tries to argue that the trial judge did not seriously consider this alternative contention because of the change plaintiff made in its position below. We note only that the trial judge devoted a page and a half to the defendant's alternative contention whereas the Supreme Court summarily dismissed the contention. *Commissioner of Internal Revenue v. Standard Life & Accident Insurance Co., supra* note 17 at 157, 97 S.Ct. 2523.

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed November 12, 1976, they are not printed herein since such facts as are necessary· to the decision are contained in his opinion.

Accordingly, we hold plaintiff is entitled to recovery as set forth in parts I, II, III, and V of the modified trial judge's opinion, as hereinafter set forth, and judgment is entered for plaintiff to that extent with the amount of recovery to be determined in a proceeding pursuant to Rule 131(c). Plaintiff is not entitled to recovery on its claims under part IV of the modified opinion. We hold defendant is entitled to the offset discussed in part VI of the modified opinion, and judgment for defendant is entered with the amount of the offset to be determined in a proceeding pursuant to Rule 131(c).

Trial Judge Fletcher's opinion, as modified by the court,** is as follows:

This action is brought for the recovery of Federal income taxes and assessed interest thereon for each of the years 1958 through 1965, together with interest thereon as provided by law. The petition originally sought recovery of $7,314,657 in income taxes and $2,325,923 in assessed interest together with statutory interest for all of the eight years involved. Since the filing of the petition however, the parties have entered into certain stipulations, the court has granted plaintiff's motion for partial summary judgment as to one issue, and several of the numerous issues raised in the petition have been dismissed. Accordingly, the exact amount of plaintiff's recovery must be determined hereafter in Rule 131(c) proceedings.

The plaintiff is The Lincoln National Life Insurance Company and is frequently referred to herein as "Lincoln" or "the Company." It is a stock corporation organized and existing under the laws of Indiana. It is engaged, and at all times relevant to this action was engaged, in the business of writing various forms of life insurance, annuities, and accident and health insurance and in reinsuring such insurance written or re-insured by other companies. During each of the years 1958 through 1965, Lincoln was a life insurance company as defined in section 801(a) of the Internal Revenue Code of 1954, as amended, and as such was subject to tax under the provisions of sections 801 through 820. Thus, it was required to make all computations entering into the determination of its tax liability in the manner specified in section 818(a), that is to say, under an accrual method of accounting, or a combination of the accrual method with any other permitted method other than the cash receipts and disbursements method.

Sections 801 through 820 were enacted into law by the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112.[1] That Act established a three-phase pattern for determining "life insurance company taxable income," only two of which are involved here.

The phase one tax base consists of "taxable investment income," as defined in section 804. The amount of a company's qualified "life insurance reserves" is an important factor in the determination of taxable investment income. Two of the issues involved in this case deal with the determination of plaintiff's life insurance reserves. They are whether Lincoln's reserve for future settlement options and reserve for term insurance policy and rider conversions meet the definition of life insurance reserves found in section 801(b).

The phase two tax base consists of "Gain from Operations," as defined in section 809. The computation of life insurance reserves and the increase or decrease in such reserves has significant phase two tax effects. In addition, a number of deductions are taken into account in the computation of gain from operations. Three of the remaining issues are concerned with deductions. They are whether Lincoln is entitled to a

** The trial judge's recommended decision and conclusions of law are submitted in accordance with Rule 134(h).

1. These complex and obscure provisions bear all the earmarks of a conspiracy in restraint of understanding. Confronted with this ultimate in complexity, it is easy to agree with Professor Edwin Cohen who, in reviewing the historical development of the Internal Revenue Code, was moved to remark that " . . . we now seem to have reached a degree of statutory intricacy that challenges basic comprehension." Cohen, *Substantive Federal Tax Reform*, 50 Va.L.Rev. 628, 629 (1964).

deduction of 3 percent of premiums attributable to certain coinsurance and modified coinsurance reinsurance contracts and whether a reserve for retrospective refunds to group contract holders may be deducted as a reserve for dividends to policyholders.[2]

The remaining issue involves the proper tax accounting procedure to be followed in accounting for deferred and uncollected premiums. The correct resolution of this issue has both phase one and phase two tax ramifications. In addition, the Supreme Court decision in *Commissioner of Internal Revenue v. Standard Life & Accident Insurance Co., supra*, has recently clarified the law on this issue.

The issues now remaining in the case are six in number and may be briefly summarized as follows:

(1) What is the correct tax accounting procedure for plaintiff to follow in accounting for deferred and uncollected premiums?

(2) Does plaintiff's reserve for future settlement options qualify as a life insurance reserve, as defined in section 801(b)?

(3) Does plaintiff's reserve for term insurance policy and rider conversions likewise qualify as a life insurance reserve?

(4) Is plaintiff entitled, in computing its gain from operations, to take into account, as part of the premiums upon which it computes the 3 percent of premiums deduction under section 809(d)(5), the premiums paid to plaintiff by ceding life insurance companies, under coinsurance and modified coinsurance reinsurance contracts, for the reinsurance by plaintiff of risks of the ceding company under participating policies issued by the ceding company? Alternatively, is plaintiff entitled, in making such computation, to take into account premiums received by it for such reinsurance under contracts for which a consent, as provided in section 820(a)(2), was not filed?

(5) Is plaintiff entitled to take into account as part of its deduction for dividends to policyholders under sections 809(d)(3) and 811(b) the amount held by it at the end of the taxable year as a reserve for retrospective group refunds on group life and accident and health insurance contracts for which the policy year ends after December 31 of a taxable year?

(6) Is plaintiff's dividend deduction limited to amounts actually paid in dividend reimbursements under § 820(c)(5)?

These questions will now be considered and resolved in order.

I. *Tax Accounting Method to be followed in Accounting for Deferred and Uncollected Premiums*

■ In *Commissioner of Internal Revenue v. Standard Life & Accident Insurance Co., supra*, the Supreme Court recently held "that the net valuation portion of unpaid premiums, but not the loading, must be included in assets and gross premium income, as well as in reserves." *Id.* 433 U.S. at 151, 97 S.Ct. at 2526. The term "unpaid premiums" is synonymous with the terms "deferred and uncollected premiums." Accordingly, we hold that plaintiff is entitled to follow the tax accounting procedure set forth in *Standard Life* in accounting for its deferred and uncollected premiums for its taxable years 1958–1965.

II. *Reserve for Future Settlement Options*

Many life insurance policies issued by Lincoln contain provisions generically described as "future settlement options," whereby either the insured or the beneficiary is entitled to elect for the proceeds of the basic policy to be paid on death of the insured in a manner other than by a lump sum payment. Some of these options involve life contingencies whereby, typically, a beneficiary is entitled to be paid a speci-

---

**2.** Reference will be made herein to the "NAIC Annual Statement." This statement is a report which Lincoln, as a life insurance company, is required to file annually, as of December 31, with the insurance regulatory authorities in Indiana and all other states wherein it conducts its insurance business. The form is prepared and prescribed by the National Association of Insurance Commissioners (NAIC), composed of state insurance regulatory authorities. It is the "annual statement" referred to in section 818(a).

fied monthly amount over his or her life. Other settlement options do not involve life contingencies such as those where an election is made to leave the policy proceeds with the company which is then obligated to pay the beneficiary either a specified rate of interest on the proceeds, or installments of principal and interest for a fixed period or in fixed amounts.

The amounts payable pursuant to the settlement options involving life contingencies guaranteed by Lincoln were computed on the basis of the American Experience Mortality Table (which had been constructed on the basis of mortality experience of people living during the last century) and a 3½ percent interest assumption, or on the basis of mortality tables and interest assumptions producing values similar to those produced by application of that table and 3½ percent interest. On the other hand, the amounts payable pursuant to the settlement options not involving life contingencies were simply computed on the basis of a 3½ percent interest assumption.

At the time the insurance contracts and riders involved herein were issued, it was estimated that the policy proceeds would be sufficient to provide the basic reserves for payment of the settlement options guaranteed thereunder. However, studies of the experience of the life insurance industry for years prior to 1953 indicated that individual annuitants were experiencing far more favorable mortality than would have been predicted on the basis of the obsolescent American Experience Mortality Table.

As a result of such studies, Lincoln determined that the beneficiaries of settlement options involving life contingencies computed on the basis of such table (or mortality tables producing similar values) would on average live longer than had been projected at the time such options were computed and that Lincoln consequently would be obligated to make payments to such individuals for periods longer than had been anticipated at the time the settlement options were guar-

anteed. Lincoln also determined that the interest rate guaranteed in the settlement options was in excess of the amounts it expected to earn based on the facts then known to it.

The basic life insurance reserves in respect of such life insurance policies and riders, the tax treatment of which is not here in issue, were required to be, and were, computed upon the basis of the American Experience Mortality Table and 3½ percent interest, or on mortality and interest assumptions producing similar values. Lincoln was required by the law of Indiana and the other states in which Lincoln carried on its insurance business to maintain and not to reduce such basic life insurance reserves.

In 1959, Lincoln strengthened[3] its life insurance reserves for the insurance policies and riders containing the settlement options by including as part of its statutory life insurance reserves an amount of additional reserve for future settlement options. The Indiana Insurance Commissioner approved the establishment of such reserve by letter dated December 29, 1959. In 1963 Lincoln further strengthened its reserve for future settlement options with respect to one type of settlement option which was not included in the 1959 strengthening. The 1963 reserve strengthening was approved by the Indiana Insurance Commissioner by letter dated December 30, 1963.

Once such "strengthened" reserve was established, Lincoln was required, by Indiana statutory provisions and by the rules and regulations of the Insurance Department of the State of Indiana, to maintain it and not to reduce or "weaken" it without the approval of the Indiana Insurance Commissioner. Lincoln's reserve for future settlement options was reported in its Annual Statements filed in each of the years 1959 through 1965. Such reserve was accepted by the Indiana Insurance Commissioner as held for the fulfillment of the claims of policyholders or beneficiaries of policies issued by Lincoln.

---

**3.** "Reserve strengthening" occurs when the reserve for a life insurance contract is increased usually because of a change in the mortality assumptions or the interest assumptions, or both, on which the original reserve was based.

In calculating the reserve for future settlement options, Lincoln did not take into account the changed mortality assumptions under more modern tables with regard to the underlying basic life reserves, but only with regard to the settlement option portion of the life insurance contracts. Had the changed mortality been taken into account with regard to these basic life reserves, defendant contends that the valuation net premiums and probably the basic life insurance reserves would have been decreased, and that it was possible the basic life reserves, if recomputed under the new assumptions, could have decreased more than enough to cover the additional "strengthened" reserves set up for future settlement options. Nor, in determining the need for a reserve for future settlement options, did Lincoln take into account that the increased longevity of the basic insureds under modern assumptions would result in the company's receiving a greater number of gross premiums from the basic insureds which would go into the company's general funds to be available for use, in addition to the policy proceeds, in funding the settlement options that might be elected at the deaths of the insureds.

While Lincoln's management and actuarial staff could hardly be unaware of these theoretical possibilities, in establishing the additional reserve for future settlement options, management obviously preferred the more conservative assumption that the amounts represented by the basic life reserves would be exactly sufficient to fund the death proceeds only. This business judgment was based upon sound actuarial principles coupled with recognition of the obvious tax benefits which flow from an addition to life insurance reserves.

An analysis of settlement options elected during the years 1954 through 1964 on policies maturing during those years showed that, of the reserves established on election of the settlement options in excess of the policy proceeds, 86.9 percent was attributable to options involving life contingencies and the remaining 13.1 percent was attributable to options not involving life contingencies.

In computing the income tax deficiencies for the years 1960 through 1965, the Commissioner excluded the reserve for future settlement options from his computation of taxpayer's life insurance reserves, an action supported by the Government primarily on the ground that such reserve is a "deficiency reserve" which is specifically excluded from life insurance reserves by § 801(b)(4).

■ The Life Insurance Company Income Tax Act of 1959 expressly recognizes that reserve strengthening, where deemed necessary by the company in its business judgment, is proper. See sections 806(b) and 810(d); H.R.Rep. No. 34, 86th Cong., 1st Sess. (1959), U.S.Code Cong. & Admin. News 1959, p. 1575, reprinted in 1959–2 C.B. 736, 749. The expert witnesses who testified on this issue appeared to be in agreement that such reserve strengthening is proper, that under the Federal tax laws a decision to strengthen reserves is within the business judgment of the life insurance company, and that Lincoln's method of computing the additional reserve was actuarially valid. However, it is entirely clear that in order for such addition to the reserves to be recognized as a "life insurance reserve" for tax purposes, it must qualify as a life insurance reserve *under the definitions set forth in § 801(b) of the Code.* The provisions of that section pertinent to this issue are as follows:

(b) Life insurance reserves defined.—

(1) In general.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed·rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with

respect to which the reserve is computed, life, health, or accident contingencies.

(2) Reserves must be required by law. —[Except for certain immaterial exceptions]

\* \* \* \* \* \*

in addition to the requirements set forth in paragraph (1), life insurance reserves must be required by law.

\* \* \* \* \* \*

(4) Deficiency reserves excluded.—The term "life insurance reserves" does not include deficiency reserves. For purposes of this subsection and subsection (c), the deficiency reserve for any contract is that portion of the reserve for such contract equal to the amount (if any) by which—

(A) the present value of the future net premiums required for such contract, exceeds

(B) the present value of the future actual premiums and consideration charged for such contract. 26 U.S.C. § 801(b).

The Government here appears to have abandoned its contention strongly urged in *Mutual Benefit Life Insurance Co. v. Commissioner of Internal Revenue*, 58 T.C. 679 (1972), aff'd, 488 F.2d 1101 (3d Cir. 1973), cert. den., 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974), that the reserve for future settlement options cannot qualify as a life insurance reserve because it is a purely voluntary reserve and therefore not a reserve "required by law" as prescribed in § 801(b)(2), *supra*. The failure to raise this contention again here is no doubt due to its rejection by the Third Circuit Court of Appeals in the *Mutual Benefit Life* case, *supra*, which is the only prior case in which this precise issue has been considered. In holding that the reserve in question was "required by law," the court said at 488 F.2d 1106:

Thus, while the initial decision to set up a reserve was entirely voluntary, its continuance was not. What the Company did in 1946 was of its own choosing, but in 1958 to 1960 it was not free to drop the reserve or to alter its formulation without having specific permission from the Insurance Commissioner. To argue that the Company was not required to carry the reserve in the years in question is to ignore reality. A man who volunteers for the Armed Forces is as subject to its discipline and regulations thereafter as any other person in service. His voluntary act in enlisting does not give him the right thereafter to question the lawful exercise of authority by his superiors. A man may enter into a marriage voluntarily, but that is not a reason to limit his obligation imposed by law to support his family. Similarly here, the Company could elect to take action permitted by the New Jersey statute, but when it did take that step, it did submit itself to the requirement that the reserve be continued thereafter. A fair reading of the income tax regulation requires us to conclude that in 1958–1960, the reserve was "required by law."

The Government does continue to make two other contentions both of which were also made and rejected in *Mutual Benefit Life*. Its primary position now is that the additional reserve is a "deficiency reserve" which is expressly excluded from life insurance reserves by § 801(b)(4) of the Code. In disapprobation of this very same contention in *Mutual Benefit Life*, the Third Circuit panel unanimously held as follows at 488 F.2d 1108–9:

The final shot fired by the Commissioner is that the "additional reserve" is a "deficiency reserve" and, thus, specifically excluded by the Code. The first and obvious question is, what is a "deficiency reserve." It is a technical term having a specific meaning in the industry which must be used in interpreting the definition of the Act. *Alinco Life Insurance Company v. United States*, 373 F.2d 336, 178 Ct.Cl. 813 (1967).

The statutory definition, 26 U.S.C. § 801(b)(4) reads:

". . . that portion of the reserve . . . equal to the amount . . . by which—(A) the present value of the

future net premiums required for such contract, exceeds (B) the present value of the future actual premiums and consideration charged for such contract."

The "deficiency reserve" is a concept in the industry which resulted from the rigid formulas imposed by state regulatory agencies in calculating "basic reserves." Many states required that the "basic reserve" for a policy was to be computed on the basis of the experience or mortality table in use at the time the policy was sold even though it was known at that time that life expectancy was increasing. This meant that in many instances the reserve was computed on the basis of a life expectancy lower than reality and therefore the premiums charged would be larger than necessary. Some companies set premium levels which they felt were adequate in view of the lengthening of life expectancy but which were less than that which strict adherence to the tables would require. The state required that in such a situation a "deficiency reserve" be set up to account for the difference between the premiums which should have been charged according to the mortality tables and those which were actually paid by the policyholder.

It may be seen that one of the distinguishing characteristics of a "deficiency reserve" is that *it is calculable at the moment of issue of a policy.* At that time, the premium actually charged and that required by the standard mortality table are known and the "deficiency" in premium may easily be established. The adoption of updated and more accurate mortality tables resulted in the elimination or decrease of many "deficiency reserve" requirements for policies sold thereafter.

A "deficiency reserve" is not used to increase a policy "basic reserve" which was adequate when issued. With this explanation as a background, *it is clear that a "deficiency reserve" as that term is used in the industry is not applicable to*

an *"additional reserve" which is set up after the policy is issued and to deal with problems that arise* *after* *issue.*

When the definition in the Act is read in conjunction with the industry meaning of the term, it is clear that the Commissioner was in error in considering the "additional reserve" as a "deficiency reserve." Here the "additional reserve" could not be ascertained at the time the policy was issued, and it was established *to meet events which occurred many years after issuance of the policies.* [Emphasis supplied and footnotes omitted.]

█ This cogent reasoning by the Third Circuit clearly resolves this issue in favor of the taxpayer. In my view, that court's persuasive opinion leaves little more to be said on the narrow question of whether a reserve for future settlement options is in reality an excluded "deficiency reserve."

However, despite the Supreme Court's refusal to review the case (*cert. den.* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122), the Government has attacked the decision as "totally erroneous" because, in the Government's view, it was based upon what the Government calls "spurious testimony" by one of the expert witnesses at the trial before the Tax Court.[4] Defendant's Brief to the Trial Judge pp. 49–51.

This position of the Government simply cannot be accepted, for it flies in the face of the statutory definition of a "deficiency reserve" which speaks in terms of the difference between "the present value of the future net premiums required" and "the present value of the future actual premiums . . . charged." It cannot be disputed on this record that the additional reserve in question was established by Lincoln on a paid-up or single premium reserve method for which there were *no future premiums, net or gross.* See finding 51. Thus, by definition and the testimony of the Government's expert, where there are no future gross premiums, ". . . you have no deficiency reserves."

---

4. For a critical description of the uncertainty and confusion which inevitably flow from such a relitigation policy, see the Preliminary Report of the U.S. Commission on Revision of the Federal Court Appellate System, Part IV, pp. A–92 to A–113 (April 1975).

The Government's only answer appears to lie in its contention that the death proceeds from the policy constitute the premium or consideration paid for the settlement option becoming operative and that the deficiency is the difference between the lump sum death benefit and the reserve established to support the settlement option payments. Similarly, in the *Mutual Benefit Life* case, the Government characterized the transaction as "the purchase of an annuity by a beneficiary with the lump sum proceeds of the policy." The court rejected the argument in these words at 488 F.2d 1107:

> We disagree and find that the insurer, in making payment under the specific settlement option involved in this controversy, does not enter into a new contract with the beneficiary but merely carries out the contractual obligation which arose with the initial issuance of the life insurance contract. *See* 19 Couch on Insurance 2d § 81:4. We see nothing in the statute which requires the construction which the Commissioner advocates and believe it contrary to generally accepted insurance law. Indeed, the government's position would come as somewhat of a surprise to the policyholder who pays the premium with the understanding that his beneficiary has the choice to take the optional settlement—at the values set out in the policy and regardless of any inclination of the insurance company to the contrary.

This seems to me an entirely correct view of the option transaction and constitutes full recognition of the hornbook principle of insurance law that under a supplemental contract issued pursuant to a settlement option, the rights and duties of the parties flow from the original contract. Essentially, it is a mere bookkeeping transaction. *See, Gram v. Mutual Life Insurance Company of New York*, 300 N.Y. 375, 91 N.E.2d 307 (1950). Accordingly, defendant's contention that the reserve in question constitutes a "deficiency reserve" must be rejected.

The Government's final point is that the reserve for future settlement options is a voluntary or "contingency reserve" and, hence, cannot qualify as a life insurance reserve under § 801(b)(1)(A), *supra*. The argument in this respect rests upon the contention that, even though the reserve concededly was computed on the basis of recognized mortality tables and an assumed rate of interest, it nevertheless does not meet the statutory requirements because in addition to the tables and assumed interest rate, Lincoln took into account a further factor, namely, that in its prior experience, Lincoln had determined that only about 20 percent of those persons eligible for the settlement options actually elected them. This, according to the Government, injected into the computation what it calls a "non-mortality" element which disqualifies the reserve as a statutory life insurance reserve.

This same argument was pressed in the *Mutual Benefit Life* case, and once again the Government's position was disapproved. The court said:

> The fact that the computation for the reserve included elements other than mortality tables and assumed rates of interest, is not sufficient to disqualify the "additional reserve." There is nothing in the statute which states that these two elements are the only factors which are permissible and that all others must be excluded. In the factual context present here, we can perceive no considerations which would require us to adopt a construction of the Act so narrow as to mandate the exclusion of circumstances which would tend to make the calculation of the reserve more exact. 488 F.2d 1107.

This resolution of the issue by the Third Circuit seems to me entirely logical and correct, and I accept it as dispositive in Lincoln's favor.

There remains for final consideration, however, Lincoln's concession that the reserve in question covered not only settlement annuities based on life contingencies

(*e. g.*, the option providing for payments to the beneficiary over his or her life)[5] but also future settlement options *not* involving life contingencies (*e. g.*, the option providing for payment of installments of principal and interest over a fixed period of time). The parties have stipulated that an analysis of settlement options elected during the years 1954 through 1964 on policies maturing during those years shows that, of the additional reserves created with reference thereto, 86.9 percent was attributable to options involving life contingencies, and the remaining 13.1 percent was attributable to options not involving life contingencies. See finding 50. From this the Government argues that at least 13.1 percent of the reserves for future settlement options cannot under any circumstances be considered life insurance reserves.

■ In response, plaintiff points out that under § 801(b)(1)(B) "life insurance reserves" means amounts which are set aside to mature or liquidate, by payment, future unaccrued claims arising from life insurance contracts involving, *at the time with respect to which the reserve was computed*, life contingencies, and that the future unaccrued claims with respect to *all* settlement options, at the time the reserve was established, involved a life contingency, namely, the life of the person insured by the policy guaranteeing the settlement options. Therefore, says plaintiff, the times in the future when payment under such options would begin were contingent on the death of the insured, an event clearly involving a life contingency. Based upon this undeniable fact, I agree that the *entire* reserve for future settlement options, including that part (13.1 percent) attributable to settlement options not involving other life contingencies, satisfies section 801(b)(1)(B).

Accordingly, plaintiff's reserve for future settlement options qualifies as a life insurance reserve, as defined in section 801(b).

## III. *Reserve for Term Insurance Policy and Rider Conversions*

Individual life insurance may be either term life insurance or permanent life insurance. Term life insurance is life insurance which provides for the payment of the face amount of insurance upon the death of the insured prior to a stated expiry date, *i. e.*, the date on which the policy expires without further value or benefit. A permanent life insurance policy does not specify an expiry date. A further difference is that the permanent type of life policy provides for cash values, and of course to the extent that cash values increase with time the net amount at company risk decreases.

During each of the years 1964 and 1965, Lincoln had in effect term insurance policies and riders issued during the years 1948 through 1963 which contained a conversion provision allowing the policyholder, at his election, to convert the term insurance to permanent insurance without evidence of insurability. Such conversion privilege is an additional policy benefit for which a charge is made. Factors taken into consideration in computing such a charge are principally the excess mortality among those exercising the privilege and, as an offset, the saving of expense to Lincoln at the time the term insurance is converted to permanent life insurance.

At the time these term insurance policies and riders were issued, the life insurance reserves established with respect to such policies were believed to be sufficient to provide for all of Lincoln's obligations under such policies. However, the Society of Actuaries conducted a study of the excess mortality on conversions of term insurance policies in which study Lincoln participated and to which, in 1963, it contributed an analysis of its mortality experience between 1954 and 1961 on 58,938 Lincoln policyholders who had converted $556,724,293 of term insurance under the conversion provisions. Lincoln's contribution to this study had revealed higher rates of mortality in all policy

---

5. It was this type of option only which was considered by the court in the *Mutual Benefit Life* case.

years among those who had converted. During 1964, plaintiff determined that the anticipated first policy year mortality rate among policyholders who elect to exercise the conversion privilege referred to above was three times the mortality rate among policyholders generally. From this determination alone, Lincoln's actuaries concluded that the basic life insurance reserves in respect of the policies and riders with term conversion privileges were not adequate to cover the excess mortality rate being experienced on the converted policies.

In 1964, therefore, Lincoln established an additional reserve for such policies and riders to provide for the increased mortality risks which are incurred as and when conversions take place. Such reserve is known as a "preconversion reserve."

In computing such reserve, Lincoln's actuaries, on the basis of Lincoln's experience, determined rates of conversion for such policies and riders. The rates of conversion were determined by reference to various ages, policy years, and types of policies. Lincoln also determined conversion costs per $1,000 of insurance converted. Such conversion costs reflected lapse rates and the mortality experience which Lincoln anticipated on the conversion policies on the basis of its past experience on this class of policies. The computation of such costs also took into account the fact that Lincoln would incur less expense at the time a comparable policy was newly issued. Using the rates of conversion and conversion costs thus computed, Lincoln then computed its life insurance reserves as if there were amounts of additional endowment benefits maturing as of the projected times of conversion. The reserve required for such additional endowment benefits (the amounts of which varied with the insureds' ages, policy years, and type of policy) was computed by use of the 1958 C.S.O. Table and 3 percent interest.[6]

The establishment of the additional reserve for term insurance policy and rider conversions was authorized by Lincoln's board of directors by resolution dated December 2, 1964. The establishment of this reserve was proposed by Lincoln, subject to approval by the Indiana Insurance Commissioner. The Indiana Insurance Commissioner approved the establishment of the reserve by letter dated December 18, 1964. Once such reserve was established, Lincoln was required by Indiana statutory provisions and by the rules and regulations of the Insurance Department of the State of Indiana to maintain it and not to "weaken" it without the approval of the Indiana Insurance Commissioner.

In computing the deficiencies for 1965, the Commissioner excluded the reserve for term insurance policy and rider conversions from his computation of Lincoln's life insurance reserves.

The Government supports the disallowance of this reserve on much the same grounds which it urged against the qualification of Lincoln's reserve for future settlement options discussed above, i. e., that the term insurance policy conversion reserve cannot qualify as a life insurance reserve because it constituted a "deficiency reserve" and in addition was based upon nonmortality contingencies. In this connection, the Government strongly emphasizes that the reserve at issue, unlike the future settlement options reserve, was not established as a result of strengthening the underlying mortality assumptions for the term policies and riders.

As plaintiff points out, the parties have stipulated in this case that the conversion privilege is an additional policy benefit for which a charge is made, and further, that the factors taken into consideration in computing such charge are, principally, the excess mortality expected among those exercising the privilege, and the saving of expense incident to converting from term to

---

**6.** Although the C.S.O. tables upon which the basic life insurance reserves for the term policies were calculated contained margins, Lincoln did not attempt to determine whether those margins were sufficient to cover the mortality experience of the company in the subsequent conversions because those basic life insurance reserves were required by state law to be maintained on the statutory basis upon which they were originally established.

permanent life insurance. However, as the Government has established, Lincoln never really attempted to determine whether the valuation net premiums or the reserves based thereon as set up to cover the term policies might be adequate to cover the conversion right. Instead, Lincoln made the assumption that the gross premium to be charged for the converted, or permanent policy, was only adequate to fund the benefits of a group who could prove continued insurability and that an additional gross premium would be necessary to cover the anticipated excessive mortality of the group of higher risk policyholders converting to permanent insurance.[7] To the Government it is clear that if Lincoln had given consideration to the adequacy of its original reserves covering additional policy benefit of a conversion privilege, it would have found that its original reserves were adequate. Unlike the reserve for future settlement options, the Government asserts that Lincoln can make no claim that the actual mortality assumptions had changed with regard to term insurance policyholders, but only that from its own experience and the studies of The Society of Actuaries it became advisable from a business point of view to take into account the fact that, of the group of original term insureds, a disproportionate number of those with higher risk potential would elect to convert their policies. The Government then concludes that what Lincoln actually based its term conversion reserve on was the concept of a premium deficiency reserve for which the premium to be charged the permanent policyholder is considered merely adequate to cover the benefits of a group of standard insureds, and an addition to the gross premium must be determined to cover the contingency that a disproportionately substandard group would make the conversion election. Therefore, the argument goes, the reserve is an unqualified deficiency reserve.

While admittedly the question is a close one, I cannot agree with the Government's position. It confuses the reserves applicable to term policies with those applicable to the independent new permanent policies to which the term policies may be converted. This confusion may well stem from the Government's failure to recognize the parties' stipulation which, in effect, agrees that the purchaser of one of Lincoln's term insurance policies or riders containing a conversion privilege bought and paid for not only the term insurance death benefit payable upon death of the insured during the contract term but also bought and paid for an additional insurance benefit which guaranteed that the company would issue a policy, upon exercise of the conversion privilege, on the same underwriting basis as it had issued the term insurance contract, regardless of possible changes in the insured's insurability. Lincoln, thus, guaranteed its insured's future insurability and became obligated to provide funds for any additional reserves required for the expected excess mortality risk under the conversion policies. The term conversion reserve in issue here was established to fulfill that additional insurance benefit under the term insurance contracts, and there can be no question that Lincoln may properly establish a life insurance reserve for that additional insurance benefit independent of the reserve for the death benefit itself.

█ The record satisfactorily shows that Lincoln maintained the appropriate death benefit reserves for the term insurance contracts involved here and decided in 1964 that it needed an additional reserve for the conversion insurance benefit. The reserve in issue is that additional reserve. It is not, as the Government suggests, a reserve under the conversion policies.[8] Accordingly,

---

7. The practice of some term policyholders electing to convert their term policies to permanent insurance at a time when they have become a substandard risk is often referred to as "anti-selection against the company." Obviously, to the extent that such substandard risks elect to convert from term to permanent cover-

age, the mortality experience in the remaining group would improve since the substandard risks would no longer be included therein.

8. The post-conversion reserve for the conversion policies is not in issue here. That is the reserve established "*at the time of conversion*"

the provisions of § 801(b)(4) defining deficiency reserves have no application to the reserve at issue here.

■ Finally, the Government contends that, since the reserve was dependent upon an assumption that a specified percentage of those eligible to elect the conversion would actually convert, the reserve must be disallowed for the additional reason that it is based upon nonmortality factors, contrary to § 801(b)(1)(A). It says further that the case is even stronger for disallowance of the term conversion reserves since the mortality assumptions with regard to the group eligible for the election have not been changed, and that Lincoln merely selected a portion of the total group—those electing permanent coverage—to compute an additional reserve based on that portion's constituting substandard risks.

The Government's position is not supported by the expert testimony. To the contrary, that testimony shows that Lincoln's mortality assumptions with respect to the electing group did change. See findings 63 and 64. The fact that so-called "nonmortality" factors were also considered in an effort to make the reserve calculation more exact does not disqualify the reserve. *Mutual Benefit Life Ins. Co., supra.*

■ Consequently, Lincoln's reserve for term insurance policies and rider conversions clearly qualifies as a "life insurance reserve" under § 801(b).

## IV. Deduction Under Section 809(d)(5) in Respect of Coinsurance and Modified Coinsurance Reinsurance Contracts

During each of the years 1958 through 1965, Lincoln had in effect reinsurance contracts with other life insurance companies of the types customarily referred to in the life insurance industry as coinsurance contracts and modified coinsurance contracts. Under such reinsurance contracts Lincoln (the "reinsurer") agreed to indemnify another life insurance company (the "ceding company" or "the reinsured") against the risk, or part thereof, assumed by the ceding company under either insurance contracts issued by it on the lives of individual insureds or reinsurance contracts with respect to which such reinsured company was itself a reinsurer.

Under an *indemnity* reinsurance contract (as distinguished from an *assumption* reinsurance contract), there is no privity of contract between the reinsurer and the policyholders of the reinsured company. With respect to such a contract, the obligations and duties of the reinsurer run solely to the reinsured insurance company, and the reinsurer has no direct obligation or duty to the policyholders of the reinsured company for payment of losses or other policy benefits, or for refund of premiums.

Risks under participating, as well as nonparticipating, insurance policies issued by other life insurance companies were reinsured by Lincoln during the years 1958 through 1965 under its coinsurance and modified coinsurance reinsurance contracts. Such participating policies issued by other life insurance companies provided for the payment by the issuing life insurance company to the policyholders of dividends dependent upon the experience of the issuing life insurance company, or the discretion of its management, or both. The declaration by the ceding company of dividends on participating policies, or the portions thereof, reinsured by Lincoln did not depend in any way upon either the experience of Lincoln or the discretion of Lincoln's board of directors.

A participating insurance policy[9] is a contract pursuant to the terms of which the

---

which plaintiff's expert witness characterized as a form of deficiency reserve but immediately specified that it is not, however, a "premium deficiency reserve," *i. e.*, that defined in § 801(b)(4).

9. Premiums on participating policies contain a deliberate overcharge by the insurance company to provide a margin in order to cushion adverse experience in mortality, interest, or expenses. The company intends that these overcharges will be returned to the policyholder in the form of dividends. The overall objective of participating insurance is to return, in the form of dividends, the money that the policyholders

policyholder has a right to participate in the divisible surplus of the insurance company that issued the contract, whereas a nonparticipating insurance policy is one which contains no such right. Lincoln's coinsurance and modified coinsurance reinsurance contracts do not provide any right to any person to participate in Lincoln's divisible surplus. Thus, even though Lincoln shared with the ceding companies most of the aspects of the reinsured policies (such as expenses, commissions, death claims and the like), Lincoln's reinsurance contracts are properly deemed nonparticipating because of the absence of any right by any other party to participate in Lincoln's divisible surplus.

A reinsurance premium for coinsurance and modified coinsurance reinsurance was payable to Lincoln annually in advance on the anniversary of the issue date of the policy. Lincoln's coinsurance and modified coinsurance reinsurance contracts, in their provisions establishing the method of computing the amount of reinsurance premiums to be paid to Lincoln by the reinsured company, provided that reinsurance premiums paid to Lincoln would equal the premiums charged by the ceding company reduced by, among other items, the cash equivalent of any dividends paid or credited by the ceding company with respect to the reinsured portion of a participating insurance policy of such ceding company. This contract formula imposed an absolute contractual limitation on the amounts of the reinsurance premiums payable to Lincoln and was determined solely by the contractual relationship between Lincoln and the reinsured company, without regard to Lincoln's experience, its divisible surplus, or the discretion of its management. Lincoln's board of directors had no discretion, nor was its authorization required, in connection with the reduction

of the premium payable to Lincoln by the appropriate portion of dividends paid or credited by ceding companies to their policyholders.

A ceding company has the right to increase or decrease its dividend scale for participating contracts without the approval or consent of Lincoln.[10] A discretionary decision by the board of directors of the ceding company to increase its dividend scale would be based upon the totality of the ceding company's experience and would not be determined in whole or in part by the experience of Lincoln. It is a virtual certainty that the total experience of Lincoln on the reinsured business of a particular ceding company would be somewhat different from the total experience of such ceding company in the determination of its dividend scales. Thus, it is possible that Lincoln could be required under its reinsurance contracts to reimburse a ceding company for dividends paid by it in an amount greater than Lincoln's own experience on its reinsurance would justify as necessary or prudent.

The term "divisible surplus" of an insurance company was defined by Lincoln's expert actuary as an amount which has been accumulated from the earnings of the life insurance company, either in the current year or in past years, and which has been declared to be available for distribution to policyholders pursuant to a discretionary decision made by the company's board of directors. Plaintiff's coinsurance and modified coinsurance contracts in existence during the years 1958 through 1965 did not contain any provision granting either to the ceding company or to the person insured by the ceding company the right to participate in the divisible surplus of Lincoln. Thus it is that Lincoln assumed an absolute (not a discretionary) contractual obligation by vir-

---

of a block of policies have contributed to surplus over the lives of the policies.

**10.** Insurance companies generally establish dividend scales on their participating contracts which are changed from time to time. In determining the pricing of their reinsurance, reinsurers such as Lincoln will examine into the ceding company's existing dividend scales and

practices in changing them. Although, as previously stated, Lincoln has no right whatever to control the amount of dividend declarations by the ceding company, it is justified in believing that considerations of good will and future business relationships will deter the ceding company from declaring exorbitant dividends.

tue of its reinsurance contract provisions to reimburse ceding companies for policyholder dividends in respect of participating policies, or the portions thereof, reinsured by Lincoln under its coinsurance or modified coinsurance contracts, without regard to whether Lincoln might have concluded that the payment of such dividends was not warranted by its own experience or the judgment of its management.

For each of the years in suit, Lincoln was entitled to a deduction under § 809(d)(5) in an amount equal to 10 percent of its increase in reserves for nonparticipating contracts, or (if greater) an amount equal to three percent of the premiums attributable to nonparticipating contracts issued or renewed for periods of five years or more. The Commissioner reduced Lincoln's deductions under § 809(d)(5) by excluding from the premiums on which the three percent deduction was claimed [11] amounts received as premiums on the coinsurance and modified coinsurance of the participating policies on the grounds that they should not be treated as premiums on nonparticipating contracts within the meaning of that section.

Lincoln contends that the reinsurance premiums are fully subject to the deduction under § 809(d)(5). In the alternative, it contends that the reinsurance premiums on modified coinsurance contracts for which consents have not been filed under the Section 820 election should not be excluded from the deduction.

The Government contends that the entire amount of reinsurance premiums on participating policies reinsured under the coinsurance and modified coinsurance agreements should be excluded from the deduction, except to the extent any of these premiums were erroneously excluded twice in the calculation.

In determining its "life, insurance company taxable income" (as defined in § 802(b))

a life insurance company must compute, among other things, "Gain and Loss from Operations." Section 809(b)(1) defines "Gain from Operations" as that amount by which certain items of income exceed the deductions provided by § 809(d). One of those deductions is set forth in § 809(d)(5), reading in pertinent part, as follows:

> (5) CERTAIN NONPARTICIPATING CONTRACTS—An amount equal to 10 percent of the increase for the taxable year in the reserves for nonparticipating contracts or (if greater) an amount equal to 3 percent of the premiums for the taxable year (excluding that portion of the premiums which is allocable to annuity features) attributable to nonparticipating contracts (other than group contracts) which are issued or renewed for periods of 5 years or more . . .

It is apparent that this statutory provision specifies four requirements which must be met to qualify for the alternative [12] 3 percent of premiums deduction, namely, (1) that portion of premiums received which is allocable to annuity features must be excluded; (2) the premiums must be attributable to *nonparticipating* contracts; (3) premiums on group contracts must be excluded; and (4) the contracts in question must have been issued or renewed for periods of 5 years or more.

The parties have stipulated that no portion of the coinsurance and modified coinsurance reinsurance premiums excluded by the Commissioner was allocable to annuity features or group contracts, and it is undisputable that Lincoln's coinsurance and modified coinsurance reinsurance contracts were issued or renewed for periods of 5 years or more.

Thus, the one remaining question is whether the premiums received by Lincoln on its coinsurance and modified coinsurance reinsurance contracts were "attributable to nonparticipating contracts" within the

---

11. In Lincoln's case, the three percent deduction was greater than ten percent of its increase in reserves for nonparticipating contracts.

12. The alternative, as stated above, is applicable here since three percent of Lincoln's premiums on nonparticipating contracts for the years at issue was greater than ten percent of its increase in reserves for such contracts.

meaning of section 809(d)(5). The Government strongly urges that this question must be answered in the negative because of its view that both coinsurance and modified coinsurance reinsurance contracts essentially pass through to the reinsurer company its pro rata portion of all significant aspects of the policies reinsured. It is undisputed that, under its coinsurance and modified coinsurance agreements, Lincoln reinsured both participating and nonparticipating insurance policies and has claimed the § 809(d)(5) deduction with respect to all of that reinsurance. The Government points out that, *absent the reinsurance*, the participating policies clearly would be outside the scope of the deduction, and since under its "pass-through" theory, the reinsured participating policies must retain their participating character even in the hands of the reinsurer, the deduction is available only with respect to the reinsured insured *nonparticipating* policies. In support of these contentions, the Government relies heavily on its Rev.Rul. 65–236, 1965–2 C.B. 229 which adopts the "pass-through" concept in the following language at p. 231:

> Section 820(c)(5) of the Code places the reinsurer in the same position as the ceding company. Thus, where a policyholder dividend has been declared and is payable with respect to a participating policy reinsured under a coinsurance or modified coinsurance agreement, the obligation which the reinsurer assumed included the allowance of the stated proportion of all dividends declared by the insurer. Both the ceding company and the reinsurer have divided deductions on their pro rata share of the risks involved.

Therefore, the policies reinsured under a coinsurance agreement retain the same identity as to the classification of policies to the reinsurer as they have to the ceding company for purposes of the deduction allowable under section 809(d)(5) of the Code. If a reinsurance contract is with respect to risks on both participating and nonparticipating policies, the deduction allowable to the reinsurer under section 809(d)(5) of the Code would be appropriate only on the portion applicable to the nonparticipating policies written by the ceding company.

Accordingly, to the extent reinsurance under either a "coinsurance" or "modified coinsurance" agreement is with respect to participating policies issued by the ceding insurance company, the reinsuring life insurance company is not entitled to a deduction under section 809(d)(5) of the Code.

The plaintiff responds to those arguments by pointing out correctly that it has established beyond contradiction that neither the ceding company nor the individual policyholder has any right to participate in Lincoln's divisible surplus. It follows, says plaintiff, that under the definitions of "participating" and "nonparticipating" contracts set forth in Treas.Regs. §§ 1.811–2(a) [13] and 1.809–5(a)(5)(ii), [14] respectively, Lincoln's coinsurance and modified coinsurance reinsurance contracts are "nonparticipating contracts" which are entitled to the deduction allowed in § 809(d)(5).

Lincoln is obviously correct in its contention that its *reinsurance contracts* are nonparticipating since they create no right in anyone to share in Lincoln's divisible surplus.

▮ The grave difficulty with the argument, however, is that Lincoln persists in referring to the wrong "contract." When § 809(d)(5) allows a deduction equal to three percent of the premiums "attributable to nonparticipating contracts," it is in no sense referring to nonparticipating *reinsurance contracts*. Instead, it refers to the underlying policy contracts which are reinsured in whole, or in part, by the coinsurance or modified coinsurance reinsurance contract. In other words, it is as though the statute read "attributable to nonparticipating *policies*."

---

**13.** Defining a participating insurance contract as one "which during the taxable year contains a right to participate in the divisible surplus of the company."

**14.** Defining nonparticipating contracts as those "which during the taxable year contain no right to participate in the divisible surplus of the company."

That this was the Congressional intent is manifest from Senate Report No. 291, 86th Cong., 1st Sess., U.S.Code Cong. & Admin. News 1959, p. 1575, accompanying H.R. 4245 (the Life Insurance Company Income Tax Act of 1959), 1959–2 C.B. 770. In discussing the reasons for the Senate Finance Committee amendments to the House bill providing for a "Deduction for nonparticipating *policies*" (emphasis supplied), the Senate Report states, in pertinent part, U.S. Code Cong. & Admin.News 1959, pp. 1575, 1597 at 1959–2 C.B. 786:

> . . . Your committee has recognized the validity of the reasons for providing such a deduction and has therefore continued it in your committee's version of the bill. However, basing this addition, as does the House bill, only upon additions to life insurance reserves does not take account of the mortality risk factor present in *policies* involving only small reserves. To overcome this deficiency, your committee's amendments provide that a special 3 percent deduction based on premiums is to apply, instead of the 10 percent deduction, where it results in a larger deduction. This is a deduction equal to 3 percent of the premiums for the current year attributable to nonparticipating *policies* (other than group or annuity contracts) issued or renewed for a period of 5 years or more.
>
> As in the case of policyholder dividends, the 10 percent or 3 percent deduction for nonparticipating *policies* may enter into an underwriting loss, and thereby reduce taxable investment income, only to the extent of the $250,000 limit referred to above in the case of policyholder dividends. [Emphasis supplied.]

Nowhere in the Committee's explanation is there any reference to indicate that it also had in mind nonparticipating reinsurance contracts. We may therefore join in Judge Frank's pithy observation in another connection that "[t]he silence of Congress is strident." *Commissioner of Internal Revenue v. Beck's Estate*, 129 F.2d 243, 245 (2d Cir. 1942).

From the foregoing, the conclusion is inescapable that the Internal Revenue Service was correct in excluding from Lincoln's § 809(d)(5) deduction an amount equal to three percent of the premiums which flowed to it by reason of its reinsuring those policies which provided a right in the policyholder to participate in the divisible surplus of the ceding company. This result fully satisfies the requirements of the statute as interpreted by the Senate Report, *supra*, and shows the irrelevancy of the fact that neither the policyholder nor the ceding company has any right to participate in the divisible surplus of Lincoln. Thus, even though a participating policy has been covered by an entirely separate contract of "nonparticipating" reinsurance, the reinsured participating policy remains a participating policy unless the policyholder has agreed to the contrary by novation or otherwise. Absent the policyholder's consent, there is no way that the ceding company can convert a participating policy to a nonparticipating one either by a reinsurance arrangement or otherwise. Accordingly, the Government must prevail on this issue.

From what has been said, it is concluded that plaintiff's argument must also fail with respect to what it calls its "minor alternative," *i. e.*, that it is entitled in any event to the § 809(d)(5) deduction in respect of modified coinsurance contracts for which consents have not been filed under § 820(a)(2). Congress simply did not intend that reinsurance agreements, as such, should give rise to a § 809(d)(5) deduction at all except to the extent that they pass through the attributes of the *nonparticipating policies* they cover.

It remains to be noted, however, that the amounts excluded by the Service from the premiums upon which Lincoln computed its § 809(d)(5) deduction included the dollar amount of experience rate credits which Lincoln had allowed on certain of its coinsurance and modified coinsurance contracts and had already excluded from the premiums on which it computed its deduction. Therefore, the inclusion of such amounts in the amounts excluded by the Service resulted in a double exclusion which is prohibited.

The Service adjustments in this regard were overstated by the amounts of experience rate credits set forth in finding 81.

## V. Reserve for Retrospective Group Refunds

At the end of each of the years 1957 through 1965, Lincoln had in effect group life insurance and group accident and health insurance contracts [15] which by their terms provided for a refund of premiums to be paid or credited by Lincoln to the holder of such a group contract as of the anniversary date of the contract in an amount to be determined on the basis of experience under such contracts during the contract year ending with such anniversary date. Such an arrangement is known as a "retrospective refund" or a "rate credit" or a "premium refund."

Lincoln computed the amount of such retrospective refunds on the basis of its refund formulae. For informal accounting purposes such refunds were treated by Lincoln as premium refunds, but, for tax purposes, such refunds were required to be treated as "dividends to policyholders" within the meaning of § 811. In its NAIC Annual Statements for each of the years 1957 through 1965, Lincoln carried a reserve for these retrospective group refunds in the following amounts:

| Year | Amount |
|------|--------|
| 1957 | $1,884,812 |
| 1958 | 1,580,017 |
| 1959 | 1,662,734 |
| 1960 | 1,983,444 |
| 1961 | 2,888,869 |
| 1962 | 3,248,742 |
| 1963 | 3,792,130 |
| 1964 | 4,079,185 |
| 1965 | 4,128,160 |

This reserve represents an estimate of the amount of refund allocable at December 31 of each year to group life insurance and group accident and health insurance contracts on the basis of experience for the contract year or portion thereof ending on or before December 31.

The amount included in the NAIC Annual Statement reserve for retrospective refunds for contracts having an anniversary date of January 2 or later in the following year was computed on the basis of actual experience on such contracts for the portion of the contract year through December 31. For this computation Lincoln used a formula which produced approximately the same result that would have been obtained by the application of the more detailed refund formulae used at the end of a group contract policy year. Such computation produced a reasonably accurate estimate of Lincoln's liability for such retrospective refunds as of December 31 of each of such years.

With regard to the retrospective group refunds involved in this case Lincoln's board of directors did not formally resolve to pay out retrospective refunds since the company was obligated by the terms of the policy to do so. At the December meeting of Lincoln's board of directors during each of the years 1960 through 1965, resolutions were nonetheless adopted which reflected the board's approximation of the reserve that would subsequently be more precisely determined and included in Lincoln's NAIC Annual Statement. These resolutions did not constitute a declaration of divisible surplus, an allocation of surplus to individual policies, or a setting aside of specific assets for payment to the policyholders, nor did they in any way affect the obligation of the company to pay retrospective group refunds.

Prior to 1960, taxpayer claimed no deductions with regard to reserves for retrospective group refunds. Taxpayer deducted on its tax return for the year 1960 the full amount estimated by its board of directors in December of 1960 that would be included in the reserves shown in the annual statement. For the years subsequent to 1960, taxpayer deducted only the increases and decreases in those board of directors' estimates over the preceding year's estimate. It now claims that either those amounts deducted in its federal income tax returns

15. Group insurance, as the name implies, is insurance under a contract which provides life or disability insurance, or both, on a group of persons covered by such contract.

or the increases or decreases in actual reserves shown in its annual statement should be taken into account in determining its dividend deductions.

The Internal Revenue Service computed the deficiencies for the years in suit without allowing any deduction for retrospective group refunds included in the annual statements or the board's resolutions. The Government has now conceded that the retrospective group refunds included in the reserves which are in fact due and owing to policyholders as of December 31 are deductible, and that the increases or decreases in those amounts for the years 1960 through 1965 should be taken into account in computing Lincoln's dividend deduction. It asserts, however, that reserves for dividends to policyholders may not include amounts held as reserves for retrospective refunds which are attributable to a group contract for which the policy year expires after the close of the taxable year on the ground that in such cases as of December 31 all events have not occurred fixing the amount of the company's obligation to pay such refunds. *See* Rev.Rul. 67–180, 1967–1 C.B. 172. In the alternative, even if these contested reserves for retrospective group refunds are deductible, the Government contends that for 1960 only the amount of *increase* in the reserve, and not the *full amount* of that reserve as claimed by Lincoln, is deductible.

▮ In my opinion, the Government's primary contention is erroneous and must be denied as in conflict with Treas.Reg. § 1.811–2(c)(1)(ii) and the decision of the United States Tax Court in *Bituminous Casualty Corp.*, 57 T.C. 58 (1971), *appeal dismissed nolle prosequi* (7th Cir. 1972), *Acq.*, 1973–2 C.B. 1.[16] To the contrary, the Government's alternative contention appears to be entirely sound, and, accordingly, Lincoln's deduction for its 1960 retrospective group refund reserve must be limited to $320,710, being the difference between

the reserve claimed in its 1960 tax return and the prior year's reserve shown in its 1959 annual statement.[17]

At the outset, it is appropriate to note that in computing its gain from operations, Lincoln was entitled by § 809(d)(3) to deduct "dividends to policyholders (determined under section 811(b))." Insofar as pertinent here, § 811(b) provides that:

(1) In general.—* * * the deduction for dividends to policyholders for any taxable year shall be an amount equal to the dividends to policyholders paid during the taxable year—

(A) increased by the excess of (i) the amounts held at the end of the taxable year as reserves for dividends to policyholders (as defined in subsection (a)) payable during the year following the taxable year, over (ii) such amounts held at the end of the preceding taxable year, or

(B) decreased by the excess of (i) such amounts held at the end of the preceding taxable year, over (ii) such amounts held at the end of the taxable year.

There is no dispute that the term "dividends to policyholders" includes retrospective refunds such as those here involved. The parties have so stipulated, and Treas. Reg. § 1.811–2(a) provides in pertinent part:

(a) *Dividends to policyholders defined* * * * [A]ny amount refunded or allowed as a rate credit with respect to either a participating or a nonparticipating contract shall be treated as a dividend to policyholders if such amount depends on the experience of the company.

Finally, the Treasury Regulation under construction here provides in relevant part as follows:

The term "reserves for dividends to policyholders" as used in section 811(b)(1)(A) and (B) * * * means only those amounts—

---

**16.** It follows, of course, that Rev.Rul. 67–180, *supra*, upon which the Government relies for its primary position, must likewise be disregarded because of the ruling's inaccurate interpretation of the applicable regulation.

**17.** In its reply brief, Lincoln makes no effort to refute this alternative contention from which failure it may be justifiably inferred that Lincoln concedes its accuracy.

(i) Actually held, or set aside as provided in subparagraph (2) of this paragraph [*i. e.*, set aside before the 16th day of the third month of the year following such taxable year] and thus treated as actually held by the company at the end of the taxable year, and

(ii) With respect to which, at the end of the taxable year or, if set aside, within the period prescribed in subparagraph (2) of this paragraph [*i. e.*, before the 16th day of the third month following the taxable year], the company is under an obligation, which is either fixed or determined according to a formula which is fixed and not subject to change by the company, to pay such amounts as dividends to policyholders \* \* \* during the year following the taxable year. [Treas.Reg. § 1.811–2(c)(1).]

As previously noted, the Government agrees that retrospective refunds *actually made* by Lincoln during its taxable year are deductible as dividends paid under §§ 809(d)(3) and 811(b) and, further, that the increase in the amounts held at the end of the taxable year as reserves for dividends to policyholders (which includes the reserve for retrospective refunds) payable during the following year is likewise deductible. However, it vigorously denies the deductibility of any reserves not held in the annual statement based solely on experience contributing to the company's year-end surplus and not "set aside" by at least the succeeding March 15. According to the Government the reserves representing the taxable year's portion of the policy years which have not expired by December 31, have not been "set aside" within the statutory period and do not represent "determined" obligations at the end of the taxable year within the meaning of the above quoted regulations § 1.811–2(c)(1)(ii) so as to be deductible.

Lincoln's response to these propositions is simply that the Government has ignored the clear language of the Treasury's own regulations in section 1.811–2(c)(1)(ii) which permits an insurance company to deduct the annual increase in a reserve for dividends to policyholders if that reserve is held in respect of an obligation that is either fixed or "determined according to a formula which is fixed and not subject to change by the company." Lincoln points out that in computing the amount of its obligation to pay retrospective refunds for each of the calendar years 1957 through 1965, as set forth in its NAIC Annual Statements, a formula was used which was "fixed and not subject to change by the company." This formula produced approximately the same result that would have been obtained by application of the more detailed refund formula used at the end of a policy year to determine the amount of retrospective refunds for each policy. Since the amounts thus determined by application of the formula were reasonably accurate estimates of Lincoln's liability for retrospective refunds as of December 31 of each such year, Lincoln asserts that its reserve for retrospective refunds clearly satisfies the plain language of Treas.Reg. § 1.811–2(c)(1).

The meaning and proper application of the regulation involved is not nearly as clear and simple as Lincoln would have it.[18] Yet, on balance, it seems to me that Lincoln has the better of the argument.

It is reasonably clear that the reserve in issue was held because of Lincoln's contractual obligation to pay retrospective group refunds, an obligation determined as of the end of each calendar year pursuant to a formula which is fixed and not subject to change by Lincoln. This would seem to qualify the reserve. But, says the Government, there are contingencies attached to Lincoln's obligation, such as possible maturity of the policy or non-payment of the following year's premium, which may well result in the payment of less than, or none of, the amount of dividends determined and reserved as of December 31.

---

**18.** There is no such thing as words so plain that they do not have to be interpreted, and virtually any statutory or regulatory phrase is open to construction. Especially in complex provisions such as here involved, it is a chimerical illusion that there ordinarily is a meaning at once apparent to the honest understanding of even the expert actuary.

However, the Government appears to agree that Congress, in respect of reserves for dividends on *individual* policies, adopted the industry practice of ignoring such future contingencies beyond the company's control so that the "all events" test does not apply to dividend reserves for such policies. It is not at all apparent from the Government's argument why these principles applicable to dividends on individual policies do not apply equally in the case of dividends on group policies.

In further support of its position, Lincoln relies on the decision of the United States Tax Court in *Bituminous Casualty Corp., supra.* The court there held that a reserve for retrospective rate credits on certain casualty insurance policies for which the policy year expired in the following calendar year must be taken into account under Treas. Reg. § 1.832–4(a)(3)(ii) in computing "unearned premiums" for the taxable year. While the case involves casualty insurance rather than life or disability insurance, the reasoning of the court is equally applicable to the present question because the reserve for retrospective rate credits involved in *Bituminous* is similar in all significant respects to the reserve for group retrospective refunds involved in this case. In both cases, the reserve was computed on the basis of experience through December 31 and the amount of refunds, if any, which would be paid to the policyholders of contracts for which the policy year had not expired as of the end of the taxable year depended in part upon experience during the portion of the policy year after the close of the taxable year.

The Government's position in *Bituminous*, which was apparently based on Revenue Ruling 67–225, 1967–2 C.B. 238, parallels its position in the instant case, which is based on Revenue Ruling 67–180, *supra.* With respect to Rev.Rul. 67–225, the Tax Court had this to say at 57 T.C. 82:

> To the extent that respondent relies upon Rev.Rul. 67–225, 1967–2 C.B. 238, we think the ruling is invalid and erroneous because (1) it is inconsistent with the plain language of the regulations; (2) it

seeks to apply an "all events" test to insurance liabilities in a manner inconsistent with the intent of Congress, the Treasury regulations, and established industry practice; (3) its interpretation of the regulations is wrong; and (4) it is contrary to the "legislative history" of the regulations.

These observations of the Tax Court apply equally to Rev.Rul. 67–180 here involved, and it is interesting to note that the Internal Revenue Service has now acquiesced in the *Bituminous Casualty* decision at 1973–2 C.B. 1 and has revoked Rev. Rul. 67–225 at 1973–2 C.B. 220.

Although the technical way in which the deduction for retrospective rate credits is to be taken into account by a non-life company (as unearned premiums) differs from the tax accounting for such rate credits by a life company (as dividends to policyholders), the principle of the *Bituminous Casualty* decision—namely, that the December 31 reserve for such rate credits is to be taken into account in computing taxable income— is equally applicable to a determination of the same issue presented in this case. Accordingly, Lincoln must prevail on this aspect of the question.

However, this is not the end of the matter, for, as previously mentioned, even though Lincoln's reserves for retrospective group refunds are subject to the deduction, the amounts claimed for 1960 are in excess of the statutory allowance. This arises out of the fact that Lincoln had claimed no deduction for reserves for retrospective refunds prior to 1960, although the amounts of these reserves were included in the annual statements for those years. In 1959, Lincoln held a reserve for the retrospective refunds in its annual statement in the amount of $1,662,734. In 1960, the reserve was in the amount of $1,983,444, an increase over the prior year of $320,710. In its tax return, Lincoln claimed a deduction for the reserve for retrospective group refunds for 1960 in the amount of $1,900,000, which was the amount of the reserve estimated by its board of directors in December of 1960.

As a general accounting technique, where estimates of future expenditures (expense reserves) are deductible, *only the increase* in the estimate over the preceding year's estimate is deductible. This precludes a double deduction for both the year end estimate of expenditure and the subsequent actual expenditure or the next year end's estimate of the same expenditure.

These general accounting rules were codified with regard to the specific deductions permitted for reserves of life insurance companies by Section 809(d) of the Code. With regard to the deduction for dividends to policyholders, Section 809(d)(3) refers to Section 811(b) of the Code which permits the deduction for dividends actually paid during the taxable year *together with the increase* in the reserve for dividends held at the end of the taxable year over the amounts held at the end of the preceding taxable year. Since the reserves held in the annual statements increased from 1959 to 1960 by $320,710, Lincoln is limited to that deduction by the statute.

VI. *Defendant's Offset Issue Regarding Dividend Reimbursements Under Coinsurance and Modified Coinsurance Reinsurance Contracts*

As previously stated, under its coinsurance or modified coinsurance contracts, Lincoln was obligated to reimburse ceding companies for policyholder dividends in respect of the participating policies, or the portions thereof, reinsured by Lincoln. The amounts of dividend reimbursements were determined solely by the contracts between Lincoln and the ceding companies, without regard to Lincoln's experience, its divisible surplus, or the discretion of its management. In each of the years 1957 through 1965, plaintiff carried amounts on page 3 of its NAIC Annual Statement with respect to this liability to its ceding companies for reimbursement of dividends in the following year under such reinsurance contracts.

Prior to 1959, plaintiff did not claim any deduction on its tax returns with respect to such anticipated liability. However, on its tax return for the year 1959, plaintiff took into account in computing its deduction for dividends to policyholders under section 809(d)(3) the $8,500,000 included at line 12 of page 3 of its NAIC Annual Statement for such year, which amount had been "allocated and set aside" by resolution of its board of directors dated February 17, 1960, as the amount of Lincoln's liability as of December 31, 1959, to make dividend reimbursements to ceding companies during the period January 1, 1960 to August 31, 1960.

By board resolution dated February 15, 1961, plaintiff estimated that the amount of its liability as of December 31, 1960, to reimburse reinsured companies during the period January 1, through August 31, 1961, for dividends paid by such reinsured companies was $8,500,000. Plaintiff took this amount into account in its tax return for 1960, but took no deduction therefor because there was no increase in the amount of such liability from 1959 to 1960.

Lincoln, in its tax return for 1961, took into account in computing its deduction for dividends to policyholders the $13,920,000 included at line 12 of page 3 of its 1961 NAIC Annual Statement, which amount had been designated by board resolution dated March 7, 1962, as the amount of Lincoln's liability as of December 31, 1961, to make dividend reimbursements to ceding companies in the calendar year 1962. This reflected a change in Lincoln's practice during the two prior years of estimating dividend reimbursements for only the period of January 1 through August 31 of the calendar year. In its 1961 return, Lincoln included in its dividend deduction the amount of $5,420,000, the excess of $13,920,000 (estimated dividend reimbursements during all of 1962) over $8,500,000 (the prior year's estimate of such reimbursement for the period January 1 through August 31, 1961).

In its tax returns for each of the years 1962 through 1965, plaintiff, in computing its deduction for dividends to policyholders, took into account the amount included at line 12, page 3 of its NAIC Annual Statement for each of such years.

The Commissioner of Internal Revenue did not disallow any amounts held by plain-

tiff with respect to its liability to ceding companies for reimbursement of dividends in the following year under coinsurance and modified coinsurance reinsurance contracts which plaintiff had taken into account, as described above, in computing its deduction for dividends to policyholders in each of the years 1959 through 1965. Defendant has raised this issue regarding dividend reimbursements under such reinsurance contracts by way of amended answer as an offsetting defense. It contends that no deduction for these reimbursement reserves is allowable at all because, in its view, § 820(c)(5) of the Code permits a deduction only for amounts *actually paid* in reimbursement of dividends. In the alternative, it contends that even if deductions are permitted for such reserves, only the increases in those reserves from year to year can be deducted.

There is a superficial resemblance between the issue here involved and that considered *above* under the heading "Reserve for Retrospective Group Refunds." The basic similarity lies in the fact that both issues involve the deductibility of "dividends to policyholders." The likeness disappears, however, when it is recognized that entirely different Code sections are involved. It will be recalled that the retrospective group refund issue involved § 809(d)(3) which allows a deduction for dividends to policyholders "determined under section 811(b)." It will be recalled further that § 811(b) specifically provides that the amount of the deduction for such dividends shall equal the amount of dividends paid during the taxable year plus the increase in reserve held therefore at the end of the taxable year over the reserve held at the end of the preceding taxable year.

In contrast, the present issue involves an entirely different Code provision, namely, § 820(c)(5). That section reads as follows:

(5) Dividends to policyholders.—The dividends to policyholders paid in respect of the policy reinsured shall be treated as paid by the reinsurer and not by the reinsured. For purposes of the preceding sentence, the amount of dividends to poli-cyholders treated as paid by the reinsurer shall be the amount paid, in respect of the policy reinsured, by the reinsurer to the reinsured as reimbursement for dividends to policyholders paid by the reinsured. This paragraph shall apply also in respect of an insurance or annuity policy reinsured under a conventional coinsurance contract.

■■■ It is at once apparent that this section makes no reference, directly or indirectly, to either § 809(d)(3) or § 811(b). The failure to do so lends great credence to the Government's argument that Congress intended to limit the § 820(c)(5) deduction to amounts actually paid in dividend reimbursements and deliberately excluded a § 811(b) type of reserve deduction. This conclusion appears to be supported by the following statement in the Senate Report dealing with § 820:

Thus, premiums, gross investment income, capital gains and losses, reserves, and assets and expenses which are related to the insurance reinsured are generally treated as received, held, or incurred (as the case may be) by the reinsurer instead of the initial insurer. Also, dividends to policyholders, paid with respect to the policy reinsured, are to be treated as dividends paid by the reinsurer rather than the initial insurer *to the extent of reimbursement by the reinsurer to the initial insurer.* S.Rep. No. 291, 86th Cong., 1st Sess., reprinted in 1959-2 C.B. 770, 798 (1959), U.S.Code Cong. & Admin. News 1959, p. 1614. [Emphasis supplied.]

Lincoln vigorously attacks what it calls "this rigid and narrow interpretation of the language and scope of section 820(c)(5)." It points out that the inevitable result is *neither* the reinsurer *nor* the reinsured may take a deduction computed under § 811(b) taking account of a reserve for dividends payable in the following year with respect to reinsured policies which the ceding company could have deducted had there not been reinsurance.

In Lincoln's view, this is a clear discrimination against the transaction of reinsurance which it submits is entirely inconsist-

ent with the Congressional purpose in enacting § 820(c)(5). However, whatever inequity may result from restricting the dividend deduction in reinsurance to the amount of dividends actually reimbursed, it is clearly within Congressional power to differentiate between direct insurance and reinsurance. Had Congress desired to treat the two identically under § 811(b), it would have been an easy thing to have said so in § 820(c)(5). It is clear that Congress did not do so, and to me this resolves the issue in favor of the Government. If an inequity results, the solution is for Congress, not the courts.

## CONCLUSION OF LAW

Upon the trial judge's findings of fact and the foregoing modified opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiff is entitled to recovery as set forth in parts I, II, III, and V of the modified opinion and judgment is entered for plaintiff to that extent with the amount of recovery to be determined in a proceeding pursuant to Rule 131(c). The court concludes that plaintiff is not entitled to recovery for the item discussed in part IV of the modified opinion and plaintiff's claim thereunder is dismissed. It is further concluded that defendant is entitled to an offset under part VI of the modified opinion and judgment is entered for defendant to that extent with the amount of the offset to be determined in a proceeding pursuant to Rule 131(c).