**GULF LIFE INSURANCE COMPANY (formerly Life and Casualty Insurance Company of Tennessee), Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–404T.

United States Court of Federal Claims.

Feb. 7, 1996.

Richard Bromley, Chicago, Illinois, for plaintiff, with whom were Glen H. Kanwit and R. Lee Christie, of counsel.

Mary M. Abate, Washington, DC, with whom were Assistant Attorney General Loretta C. Argrett, Mildred L. Seidman, and David Gustafson for defendant.

## OPINION

MARGOLIS, Judge.

This federal income tax refund case, requiring the application of the Life Insurance Company Income Tax Act of 1959, is before the court on the parties' cross-motions for summary judgment. The question is whether dividends, paid by the taxpayer to holders of its participating life insurance policies and reimbursed to the taxpayer by a reinsurer under a modified indemnity coinsurance agreement, should be treated as policyholder dividends paid by the reinsurer, as plaintiff claims, or whether the dividends are deductible by the taxpayer and the reimbursements are income to the taxpayer, as the government contends. After careful consideration of the record, and after hearing oral argument, this court finds that no material issue of fact exists and that plaintiff is entitled to judgment as a matter of law. Accordingly, this court grants plaintiff's motion for summary judgment and denies defendant's motion for summary judgment.

## FACTS

Plaintiff Gulf Life Insurance Company ("Gulf Life"), is the successor in interest to Life and Casualty Insurance Company ("L & C"), a Tennessee stock life insurance company. At issue is the proper tax treatment of $2,630,528 in policyholder dividends, paid by L & C for the taxable year 1977 to its policyholders on individual participating life insurance policies and reimbursed to L & C by a reinsuring life insurance company under a modified indemnity coinsurance agreement.

L & C sold primarily nonparticipating life insurance policies, which provide insurance for a fixed, guaranteed premium. By contrast, a participating policy has a higher stated premium than the nonparticipating policy for the same insurance, but the policyholder expects to receive premium rebates in the form of policyholder dividends. These dividends are returned to policyholders based on the company's experience or the discretion of its management. Mutual life insurance companies, which are owned by their policyholders, offer participating policies almost exclusively. Because of its tax position, it was disadvantageous to L & C, absent reinsurance, to offer participating policies.

Rising interest rates in the mid–1960's, however, created a competitive advantage for participating policies. Market demand, therefore, forced L & C to offer participating policies. By 1977, participating policies represented 15–20% of L & C's ordinary life insurance business by premium volume.

In December 1972, L & C (as the ceding company) entered into a reinsurance agreement ("Modco Agreement") with Union Central Life Insurance Company ("Union Central") (as the reinsurer) that covered L & C's participating policies in force for 12 months or longer. Union Central was an unrelated mutual life insurance company. The Modco Agreement was a type of indemnity reinsurance known as modified coinsurance. The plaintiff acknowledges that "tax planning was a principal purpose for seeking this reinsurance agreement."

In indemnity reinsurance, the reinsurer is not directly liable to the policyholders, but must indemnify the ceding company for any payments the ceding company makes to policyholders with respect to the reinsured policies. In assumption reinsurance, on the other hand, the reinsurer steps into the shoes of the ceding company with respect to the reinsured policies, assuming all liabilities to policyholders.

There are two types of indemnity reinsurance: conventional coinsurance and modified coinsurance. These differ from each other principally in the manner of reporting reserve liabilities (the actuarially determined liabilities under the reinsured policies) to state regulators and in the custody of the investment assets supporting these reserve liabilities.

In conventional coinsurance, the reinsurer reports the reserves and obtains custody of the investment assets, just as though it were the issuer of the policies. Therefore, the reinsurer's share of the policy reserves is a liability on the balance sheet of the reinsurer, and the reinsurer invests its share of premium income from the reinsured policies to generate investment income needed to fund the policies.

Modified coinsurance differs in that the ceding company continues to report the reserve liabilities on its balance sheet, and the ceding company also retains custody of the supporting investment assets. The same transfer of insurance risks is achieved as under conventional coinsurance, but without a transfer of assets and without imposing the same degree of risk on the ceding company

with respect to the reinsurer's creditworthiness or investment acumen.

Life insurance companies are required to file detailed annual statements reporting their operating results and financial condition to state insurance regulators, utilizing the Annual Statement reporting form which the National Association of Insurance Commissioners ("NAIC") has developed and approved for use by life insurance companies. The system of accounting reflected in the NAIC Annual Statement is commonly referred to as "statutory accounting." The federal income tax provisions in effect for the tax year at issue refer specifically to these NAIC statutory accounting rules.

The rules of statutory accounting allow the reinsuring and ceding companies' income statements, under both conventional and modified coinsurance, to contain or omit certain entries so that these statements appear as they would if the reinsurer, and not the ceding company, were the issuer of the policies. Union Central and L & C followed these accounting conventions and as a result, Union Central's 1977 statutory income statement included the gross premiums paid by policyholders to L & C on the reinsured policies ($11.8 million) as part of Union Central's gain from operations, and included claims paid with respect to the policies ($2.7 million) and the policyholder dividends at issue in this case ($2.6 million) as deductions from Union Central's gain from operations. These items did not appear on L & C's statutory income statement.

The statutory accounting treatment of investment income and addition to reserve liability expense for modified coinsurance arrangements, however, are different from the statutory accounting treatment of these items for conventional coinsurance arrangements. Thus, the reporting of reserve liabilities and custody of investment assets are the distinguishing features of modified coinsurance.

On its 1977 statutory income statement, therefore, L & C reported the investment income on the assets supporting the reserve liabilities attributable to the reinsured policies ($3.7 million) and the expense due to the increase in reserves attributable to these pol-

icies ($6.6 million). In order to transfer the economic effect of these items to Union Central, L & C recorded what is termed a "modco reserve adjustment" of $2.9 million so that the three items would net to zero, and Union Central recorded an equal and opposite modco reserve adjustment entry to its gain from operations. The investment income attributable to the reinsured policies therefore did not affect Union Central's investment income account.

For 1977, L & C's policies reinsured by Union Central generated $2.2 million in profits. Of this amount, Union Central credited $2.1 million back to L & C as an "experience refund." Union Central retained the balance ($98,989) as its reinsurance fee.

Under the federal income tax provisions in effect for tax year 1977, a reinsuring and ceding company could elect to treat policies reinsured under a modified coinsurance contract as if the policies were reinsured under a conventional coinsurance contract. If this election was made, therefore, investment income related to the reinsured policies would have been treated as investment income of the reinsurer. The parties in the instant case did not wish to have such investment income treated as Union Central's investment income and therefore did not make such an election.

In filing both its 1977 Annual Statement and its 1977 federal income tax return, L & C reported no income and no expense with respect to its payment and Union Central's reimbursement of $2,630,528 in policyholder dividends covered by the Modco Agreement. This treatment of the policyholder dividends by L & C was consistent with the accounting rules of the NAIC.

On April 20, 1992, the Internal Revenue Service issued a Notice of Deficiency in L & C's federal income tax for the 1977 taxable year, in the amount of $1,171,461. Of this increase, $903,069 was attributable to the determination of the IRS that the $2,630,528 of policyholder dividend reimbursements from Union Central were includible in L & C's gross income under § 809(c) of the Code, and that the associated disbursements of dividends to policyholders of $2,630,528 were properly treated as policyholder dividends

paid or incurred by L & C, and not as policyholder dividends paid or incurred by Union Central. As a result of this determination, and the limitation on deductibility of policyholder dividends then in effect under section 809(f) of the Code, L & C's allowable deduction for policyholder dividends was increased by only $749,134.

The net effect of the adjustments was to increase L & C's "life insurance company taxable income" by $1,881,394 ($2,630,528 minus $749,134), and to increase its tax by $903,069. (The balance of the deficiency was attributable to the IRS's determination that there was no overpayment of tax for 1978 to be offset against tax due for 1977.)

On June 30, 1992, Gulf Life, as successor to L & C, paid the $1,171,461 of additional tax assessed with interest in the amount of $3,864,905. On November 6, 1992, Gulf Life timely filed a claim for refund of the tax and interest paid. On January 11, 1993, the IRS issued a notice of proposed disallowance of the claim for refund because "[a] ceding company (Taxpayer) may not transfer its deductions for dividends to policyholders to the reinsurer in a modified coinsurance agreement absent a proper consent under Section 820(a)(2) of the Code." On April 16, 1993, the IRS issued a final notice of disallowance of the claim, and on June 30, 1993, this suit for refund was timely filed.

In addition to L & C's refund claim for 1977, L & C and three other commonly owned companies have filed other claims based on the "policyholder dividend" issue, seeking refunds totalling $19,180,490 in tax, plus interest.

Federal tax provisions applicable to life insurance companies were substantially overhauled effective for tax years beginning after December 31, 1981. Among other changes, the definition of premium income was amended to specifically include reimbursements of policyholder dividends to a ceding company. L & C's reinsurance agreement with Union Central was terminated effective January 1, 1982.

## DISCUSSION

During the period in issue, L & C was a "life insurance company" within the meaning

of § 801 of the Internal Revenue Code of 1954, as amended, and was subject to federal income tax determined under Part I of Subchapter L of the Internal Revenue Code of 1954, 26 U.S.C. §§ 801–820 (1976 ed. and Supp. I), the Life Insurance Company Income Tax Act of 1959 (the 1959 Act).

Under the provisions of the 1959 Act, whether an item of income is classified as investment income and whether a life insurance company has a positive or negative net operating income have special significance. "Life insurance company taxable income" is defined generally in § 802(b) as the sum of: (1) the lesser of taxable investment income or gain from operations and (2) 50% of the excess, if any, of gain from operations over taxable investment income. Gain from operations generally includes investment income. § 809(b).

Among the other intricacies of the 1959 Act is the method of computing the allowable deduction for dividends to policyholders. This deduction generally may not exceed $250,000 plus the amount (if any) by which the gain from operations (determined without regard to the deduction) exceeds taxable investment income. § 809(f). The limitation thus ensures that at most $250,000 of policyholder dividends can be used to offset taxable investment income.

The treatment of policyholder dividends reflects a congressional effort to apportion the tax burden fairly between mutual and stock life insurance companies. A mutual insurance company generally has sizeable underwriting gains because premiums are higher than they need to be to fund the policies. These redundant premiums are generally paid back to policyholders as policyholder dividends. Dividends to policyholders paid by a mutual company are part rebate of the inflated premium (which should be deductible by the company) and part dividend to shareholders (which should not be deductible). Congress attempted to ensure that the mutuals would be able to deduct the appropriate amount of these dividends through the § 809(f) limitation.

Any policyholder dividends distributed by the typical stock insurance company, on the other hand, would generally not be deductible under the Act, since if a company's business is predominantly nonparticipating policies, the company will have underwriting losses rather than underwriting gains. This was of little significance to such companies when the law was enacted, however, as stock companies generally did not issue participating policies in 1959.

## I. The modified coinsurance arrangement is not a sham transaction which should be disregarded for tax purposes.

■ Although it is undisputed that tax planning was a principal purpose for entering the modified coinsurance agreement, and although the government terms the plaintiff's federal income tax treatment of the agreement an impermissible "sleight-of-hand," the parties nevertheless agree that the Modco Agreement was not a sham transaction which should be disregarded for tax purposes.

■ The Supreme Court has upheld the economic substance of modified reinsurance agreements. "Tax considerations well may have had a good deal to do with the specific terms of the [reinsurance] treaties, but even a 'major motive' to reduce taxes will not vitiate an otherwise substantial transaction." *United States v. Consumer Life Ins. Co.*, 430 U.S. 725, 739, 97 S.Ct. 1440, 1448, 52 L.Ed.2d 4 (1977). The Court explained that modified coinsurance "developed because some major reinsurers were not licensed to do business in New York, and New York did not permit a ceding company to take credit against its reserves for business reinsured with unlicensed companies." *Id.* at 747, 97 S.Ct. at 1452.

Further, modified coinsurance is explicitly recognized in § 820 of the 1959 Act. Far from discouraging modified coinsurance, Congress provided the § 820 election so that modified coinsurance agreements would not be subject to "inequitable" double taxation. *Consumer Life*, 430 U.S. at 747, 97 S.Ct. at 1452. The legislative history addresses this issue:

A problem of possible double taxation is presented [in the case of modified coinsurance] ... the initial insurer pays over the gross investment income, less additions to

reserves, to the reinsurer. In such cases it is possible for the same income to be taxed twice—once to the initial insurer as investment income and a second time to the reinsurer as underwriting gain. To prevent an imposition of a double tax in such cases, your committee has added a section to the bill which treats ... a policy ... reinsured in this manner ... generally as if it were a policy issued by the reinsurer instead of the initial insurer."

S.Rep. No. 291, 86th Cong., 1st Sess. (1959), *reprinted in* 1959 U.S.C.C.A.N. 1575, 1614.

If a § 820 election is not made, however, policies reinsured under modified coinsurance are not treated as though they were issued by the reinsurer. As the Senate Report recognizes, investment income on the reinsured policies is transformed into underwriting gain in the hands of the reinsurer. Congress did not address the tax implications of modified coinsurance without the § 820 election.

Through the use of the Modco Agreement without the § 820 election, L & C and Union Central achieved significant tax savings. L & C was able to avoid the 1959 Act's limitation on the deduction of policyholder dividends, receiving its experience refund net of these deductions. Union Central, a mutual insurance company, realized underwriting gain without the concomitant taxable investment income on the reinsured policies. Due to its tax position, this almost surely gave Union Central a better tax result than it would have had if it had issued the reinsured policies itself.

Subsequent to the passage of the 1959 Act, Congress determined that "[t]hrough the use of modified coinsurance agreements and the payment of experience refunds by the reinsurer, some life insurance companies have used modified coinsurance to avoid or substantially reduce income taxes." H.R.Rep. No. 760, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.C.C.A.N. 1190, 1411. When Congress acted in 1982 to substantially overhaul Subchapter L, however, it appeared to do so with an awareness that changed economic conditions since the passage of the 1959 Act had forced life insurance companies to employ these tax planning devices. In the debate which finally led to the 1982 repeal of § 820, Senator Lloyd Bentsen remarked:

In the face of this development [a higher tax burden on insurance companies due to inflation and limits on the deductibility of policyholder dividends], many of these companies employed various tax-planning methods in an effort to manage their steeply growing tax bills. In the late 1970's these methods included the use of modified coinsurance and similar arrangements, about which we have all heard a great deal lately. The Treasury Department has recently recommended that we act to prevent tax abuses by these companies through the use of ModCo and like arrangements, though the Treasury has not said what else should be done to correct the problems in the 1959 law that spurred the use of such arrangements in the first place. I do not think it advisable only to remedy a symptom; it is much preferable to cure the disease.

128 Cong.Rec. at 6423 (1982).

Although Congress repealed § 820 and amended the definition of premium income to specifically include reimbursements from a reinsurer of policyholder dividends in 1982, modified coinsurance arrangements were valid tax planning devices during the tax year at issue in this case.

II. *The plain language of the tax code does not require that reimbursements of policyholder dividends be included in L & C's income.*

■ The government's first argument, that the plain language of the 1959 Act mandates that policyholder dividend reimbursements be included in L & C's gross income, is not persuasive.

Section 809(c) provides that gain from operations "shall take into account":

(1) Premiums. The gross amount of premiums and other consideration (including advance premiums, deposits, fees, assessments, and consideration in respect of assuming liabilities under contracts not issued by the taxpayer) on insurance and annuity contracts (including contracts supplementary thereto); less return premi-

ums, and premiums and other consideration arising out of reinsurance ceded. . . .

The government argues that the dividend reimbursements received by L & C from Union Central are properly includible in L & C's gross income as "other consideration" in the first sentence of section 809(c)(1).

According to the legislative history of the 1959 Act, "[t]he computation of gains and losses is designed to arrive at the total income of the life insurance company. Thus, it includes income from all sources, including the life insurance company's share of investment income and also income derived from the operation of the insurance business itself." S.Rep. No. 291, 86th Cong., 1st Sess. (1959), *reprinted in* 1959 U.S.C.C.A.N. 1575, 1594. Further, "[g]ross receipts for this purpose include premiums and other considerations on insurance and annuity contracts and also considerations for supplementary contracts. These premiums are reduced for return premiums and premiums arising out of reinsurance ceded." *Id.* at 1595.

The legislative history also addresses the effects on premium income of experience refunds where § 820 is elected. "[T]he experience refunds paid by the reinsurer to the initial insurer are treated as reductions in premium income of the reinsurer and as 'other income' received by the initial insurer." *Id.* at 1614.

■ Even if section 820 is not elected, the Supreme Court has determined that experience refunds are return premiums to the reinsurer. *Colonial American Life v. Commissioner*, 491 U.S. 244, 259, 109 S.Ct. 2408, 2418, 105 L.Ed.2d 199 (1989). Experience refunds should therefore be included in the premium income of the ceding company. Further, as premiums "arising out of reinsurance ceded" are subtracted from the ceding company's premium income under section 809(c)(1), returns of part of these premiums in the form of experience refunds to the ceding company should be included in the ceding company's premium income.

Reimbursements of dividends from the reinsurer to the ceding company, however, arise out of a different type of transaction. L & C had remitted the gross premiums on the reinsured policies to Union Central. Pursuant to section 809(c)(1), these premiums were not includible in L & C's premium income as they were premiums "arising out of reinsurance ceded." When L & C subsequently paid dividends to policyholders (which were essentially rebates to the policyholders of part of the premiums paid), it was therefore using its own funds to pay dividends "owed" to policyholders by Union Central. L & C was not, therefore, receiving a return of the premiums it had ceded to Union Central. Unlike experience refunds, reimbursements of policyholder dividends bear no resemblance to premium income. Section 809(c)(1) therefore provides no basis for including the policyholder dividend reimbursements from Union Central in the gross income of L & C.

Most significantly, § 809(c)(1) was amended in 1982 to specifically provide that reimbursements of policyholder dividends are a category of premium income. As amended in 1982, § 809(c)(1) provides:

(1) Premiums

The gross amount of premiums and other consideration, including—

(A) advance premiums,

(B) deposits,

(C) fees,

(D) assessments,

(E) consideration in respect of assuming liabilities under contracts not issued by the taxpayer, and

(F) *the amount of dividends to policyholders reimbursed to the taxpayer by a reinsurer in respect of reinsured policies,* . . .

26 U.S.C. 809(c)(1) (1982) (emphasis added). This amendment was effective for taxable years beginning after December 31, 1981.

There is no indication in the legislative history that this addition to section 809(c)(1) was meant simply to clarify existing law. The one reference that may apply to § 809 indicates that the law was "revised." "The provisions relating to reimbursements are also revised so that policyholder dividends paid in connection with reinsured policies are treated as paid by the reinsured company rather than the reinsurer." H.R.Rep. No.

760, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.C.C.A.N. 1190, 1412.

In the absence of any indication to the contrary, a reasonable interpretation of the amendment is that a category of premium income was added to section 809(c)(1) by the 1982 Act. For tax year 1977, therefore, reimbursements of policyholder dividends were not part of premium income for federal income tax purposes.

The government argues in the alternative that Section 809(c)(3), providing that gain from operations includes all other amounts "which under this subtitle [subtitle A] are includible in gross income," mandates that dividend reimbursements be included in L & C's gross income. The government contends that the reimbursements are "gross income derived from business" under Section 61(a)(2) of title A.

This court has found that where an attorney-client contract provided that the client would reimburse the attorney for advances to the client of costs of a suit taken on a contingent fee basis, those advances were in the nature of loans and could therefore not be deducted as business expenses. *Boccardo v. United States*, 12 Cl.Ct. 184, 188 (1987). The *Boccardo* court began its analysis with a quotation from a Tax Court case:

> Where a taxpayer makes expenditures under an agreement that he will be reimbursed therefor, such expenditures are in the nature of loans or advances to another ... and are not deductible as business expenses of the taxpayer.

*Boccardo v. United States*, 12 Cl.Ct. at 186 (*quoting Electric Tachometer Corp. v. Commissioner*, 37 T.C. 158, 161 (1961)). (The Ninth Circuit found that the same taxpayers' advances to clients for litigation costs were deductible when the taxpayer changed the cost recovery provisions of its fee contracts. *Boccardo v. C.I.R.*, 56 F.3d 1016 (9th Cir. 1995).)

The Internal Revenue Service has found that reimbursements to the taxpayer by a party who shared the taxpayer's facilities and personnel "are not included in the taxpayer's gross income under section 61(a) of the Code." Rev.Rul. 84–138, 1984–2 C.B. 124.

The general rule, therefore, is that an expenditure made under a reimbursement arrangement with another party is in the nature of a loan or advance to the other party, which is nondeductible. The reimbursement is therefore in the nature of a repayment of borrowed funds, which is not gross income. Thus, the dividend reimbursements are not income to L & C under section 61(a) and are therefore not includible in L & C's gain from operations under § 809(c)(3).

III. *The policyholder dividends are treated, in Union Central's hands, as policyholder dividends subject to the § 809(f) limits on their deductibility. L & C and Union Central have therefore not evaded these limits.*

The government warns that if it does not prevail, L & C and Union Central will evade the § 809(f) limits on the deductibility of policyholder dividends. The government claims that this result will occur because the dividends cannot be treated as dividends to policyholders in Union Central's hands, but must instead be treated as return premiums fully excludable from Union Central's premium income.

Treasury Reg. § 1.809–4(a)(1)(ii) provides: The term "return premiums" means amounts returned or credited which are fixed by contract and do not depend on the experience of the company or the discretion of management. Thus, such term includes amounts refunded due to policy cancellations or erroneously computed premiums. Furthermore, amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded shall be included in return premiums.

Treasury Reg. § 1.811–2(a) provides that "amounts returned by one life insurance company to another in respect of reinsurance ceded shall not be treated as dividends to policyholders even though such amounts are not fixed in the contract but depend upon the experience of the company or the discretion of the management."

The government interprets Regulation 1.811–2(a) as requiring that Union Central

treat its reimbursements of policyholder dividends to L & C as return premiums. Therefore, the government argues, the dividends cannot be treated by Union Central as dividends to policyholders.

The Supreme Court has examined the "return premiums, and premiums and other consideration arising out of reinsurance ceded" language of § 809(c)(1) in *Colonial American Life Ins. Co. v. Commissioner*, 491 U.S. 244, 109 S.Ct. 2408, 105 L.Ed.2d 199 (1989). In finding that ceding commissions (amounts remitted by a reinsurer to a ceding company in consideration of the future income stream attributable to the reinsured policies) must be amortized, the Court determined that § 809(c)(1) did not allow the reinsurer to subtract the ceding commissions from its premium income.

The term "return premiums" more naturally refers to premiums that the insuring or reinsuring company has been paid and then must remit to the individual policyholder or ceding company, as, for example, pursuant to an experience-rated refund clause, which readjusts the amounts of policy premiums paid over to the ceding company to reflect unanticipated savings.... a plausible reading of ["premiums and other consideration arising out of reinsurance ceded"] is that it refers only to payments from the ceding company to the reinsurer, as, for example, when the ceding company is simply passing on premiums it has received from a policyholder but is obligated to deliver to a reinsurer under an indemnity-reinsurance agreement. The "other consideration" phrase, while admittedly open ended, can be read in quite a sensible way as tagalong language that refers to analogous expenditures of this kind, rather than as a broad catchall provision that encompasses payments of any kind from any party.... § 809(c) in its entirety concerns gross income; deductions are treated in a separate subsection, § 809(d). We find it incredible that Congress, with but a whisper, would have tucked away in the fine points of its definition of premium income a deduction of this magnitude.

*Id.* at 258–60, 109 S.Ct. at 2417–18.

Similarly, Regulation 1.811–2(a) has nothing to do with policyholder dividends reim-

bursed by a reinsurer; it merely clarifies that certain types of reinsurance experience refunds are not transformed into "policyholder dividends" for tax purposes. Contrary to the government's argument, Union Central, as the reinsurer, is not prohibited from taking policyholder dividends into account as "policyholder dividends" for tax purposes.

*IV. The fact that § 820 was not elected does not mean that the dividends must be treated as paid by L & C.*

■ The government claims that policyholder dividends can be treated as paid by the reinsurer only if a § 820 election is made. Section 820(a), "Optional treatment of policies reinsured under modified coinsurance contracts," provides that a modified coinsurance contract is treated "as if such policy were insured under a conventional coinsurance contract ... if the reinsured and reinsurer consent." The parties in the instant case did not make such an election. If a § 820 election is made, then, under § 820(c): (1) premiums "shall be treated as received by the reinsurer and not by the reinsured. The gross investment income ... derived from the assets in relation to the reserve on the policy reinsured shall be treated as gross investment income of the reinsurer ... (3) The reserve on the policy reinsured shall be treated as a part of the reserves of the reinsurer and not of the reinsured, and the assets in relation to such reserve shall be treated as owned by the reinsurer and not by the reinsured.... (5) The dividends to policyholders paid in respect of the policy reinsured shall be treated as paid by the reinsurer and not by the reinsured."

The government claims that since (1) if a section 820 election is made, then § 820(c)(5) specifies that policyholder dividends are treated as paid by the reinsurer, then it follows that (2) the converse is also true—if policyholder dividends are to be treated as paid by the reinsurer, then a section 820 election must be made.

The government overlooks, however, that § 820(c)(1), providing that premiums on the reinsured policies be treated as received by the reinsurer and not by the ceding company,

is exactly the same as the treatment of this premium income even if § 820 is not elected. Under § 809(c)(1), "premiums and other consideration arising out of reinsurance ceded" is excluded from the premium income of the ceding company.

Therefore, the fact that § 820 specifies that dividends to policyholders on modified coinsurance arrangements where the § 820 election is made are treated as paid by the reinsurer does not compel the conclusion that dividends must be treated as paid by the ceding company absent the § 820 election.

*V.   As there is no contrary tax rule, the plaintiff's treatment of the modified coinsurance arrangement, consistent with NAIC rules, is proper.*

■   Plaintiff contends that, as there is no contrary tax rule, this is "essentially an accounting case," and that § 818(a) therefore requires that the federal income tax treatment of policyholder dividends reimbursed under a modified coinsurance agreement be consistent with statutory accounting rules. Section 818(a) provides:

Section 818.   Accounting provisions.

(a) Method of accounting

All computations entering into the determination of the taxes imposed by this part shall be made—

(1) under an accrual method of accounting, or

(2) to the extent permitted under regulations prescribed by the Secretary, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).

Except as provided in the preceding sentence, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

The legislative history of the 1959 Act sheds a little more light on this provision:

To the extent not inconsistent with the provisions of the 1954 Code and an accrual method of accounting, all computations entering into the determination of taxes im-

posed by the new part I shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

S.Rep. No. 291, 86th Cong., 1st Sess. (1959), *reprinted in* 1959 U.S.C.C.A.N. 1575, 1649.

In *Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977), the Supreme Court relied on § 818(a) to invalidate a Treasury Regulation which was inconsistent with National Association of Insurance Commissioners accounting rules.

The taxpayer in *Standard Life* was owed "unpaid premiums" at the end of its tax year. Premiums consist of two components: the "net valuation premium," the amount the company must add to its reserves to ensure it will be able to pay death benefits; and "loading," the company's business expenses and profit. NAIC rules required the company to add an amount equal to the net valuation portion of unpaid premiums to its reserves at year end (state law also required this) and to add the same amount to its premium income. Under general rules of accounting, however, such unpaid amounts would be ignored, as the company had no legal right to collect them. *Standard Life,* 433 U.S. at 150, 97 S.Ct. at 2525.

The taxpayer deducted the expense for the addition to reserves, but recognized premium income when the premiums were paid in the following year. The IRS claimed that the taxpayer should recognize the entire unpaid premium—net valuation and loading portions—as income for the same year the taxpayer claimed the addition-to-reserve expense. *Id.* at 150–51, 97 S.Ct. at 2525–26.

The Court found that "[s]ince there is nothing in the statute [the 1959 Act] directing that any portion of unpaid loading be treated as an asset or income, the statute obviously cannot provide guidance," but that, on the other hand, using the NAIC rules "does have support in the statute. This approach has been adopted by the NAIC for the purpose of preparing the Annual Statement, and therefore is firmly anchored in the text of § 818(a) which establishes a prefer-

ence for NAIC accounting methods." *Id.* at 161. The Court further noted that "[e]vidence of congressional respect for NAIC accounting methods is not limited to the portion of the code concerning life insurance companies.... [the Code requires NAIC accounting methods to be used] for purposes of taxing certain other insurance companies...." *Id.* at 161 n. 24, 97 S.Ct. at 2531 n. 24.

The Court further found that "the general rules of accrual accounting simply do not speak to the question of the scope to be given the entirely fictional assumption [that the premiums had been paid] required by the [state] statute ... [and] [s]ince general accounting rules are not controlling, the [federal tax] statute requires use of the NAIC approach to fill the gap." *Id.* at 162, 97 S.Ct. at 2531.

The Court also noted that "[t]he first Court of Appeals to consider this argument rejected it on the ground that Congress would not have intended 'to relegate the substantive matter of offsetting or excluding loading on deferred and uncollected premiums, with its concomitant impact on the resulting tax, to the NAIC....' We think that § 818(a) gives the NAIC precisely this role of filling the gaps in the statutory treatment of accounting problems like this one." *Id.* at 162 n. 26, 97 S.Ct. at 2531 n. 26. The Court therefore concluded that "[t]o the extent that the Secretary's regulations require different treatment of unpaid premiums, we hold that they are inconsistent with § 818(a) and therefore invalid." *Id.* at 163, 97 S.Ct. at 2531.

Similarly, in the instant case, there is nothing in the statute directing the federal tax treatment of the reimbursed policyholder dividends under a modified coinsurance arrangement absent a § 820 election, and the rules of accrual accounting do not speak to the question. Although the issue in the instant case is a substantive matter with impact on the resulting tax, under *Standard Life* the 1959 Act requires use of the NAIC approach to fill the gap.

The Supreme Court rejected the application of the NAIC rules in *Colonial American Life Insurance Co. v. Commissioner*, 491 U.S. 244, 109 S.Ct. 2408, 105 L.Ed.2d 199 (1989). *Colonial American Life*, however, is distinguishable from the instant case. In *Colonial American Life*, a reinsuring life insurance company deducted the full amount of ceding commissions it paid on indemnity reinsurance contracts in the year in which they were paid. The government claimed the commissions must be capitalized over the estimated life of the underlying policies. *Colonial American Life*, 491 U.S. at 247, 109 S.Ct. at 2411. NAIC rules prescribed the current deduction of ceding commissions on indemnity, as well as assumption reinsurance contracts. *Id.* at 254–55, 109 S.Ct. at 2415–16. Although the tax "provisions do not specify in explicit terms whether ceding commissions for indemnity reinsurance may be taken as current deductions," *id.* at 249, 109 S.Ct. at 2412, the Court further found that ceding commissions for assumption reinsurance must be amortized for tax purposes. *Id.* at 255, 109 S.Ct. at 2415.

The Court also found that ceding commissions on indemnity reinsurance should be treated for tax purposes just as ceding commissions on assumption reinsurance are treated. "Although indemnity reinsurance is different from assumption reinsurance in some important ways, none of them go to the function and purpose of the ceding commissions." *Id.* at 251, 109 S.Ct. at 2413. In addition, the Court found that "[b]oth the Code and our cases long have recognized that amounts expended to acquire an asset with an income-producing life extending substantially beyond the taxable year of acquisition must be capitalized and amortized over the useful life of the asset." *Id.* at 252–53, 109 S.Ct. at 2414–15.

The Court therefore rejected petitioner's alternative argument that NAIC rules should govern the tax treatment of ceding commissions for indemnity reinsurance, finding that "petitioner's argument rests on an unduly expansive reading of the reference to the NAIC in § 818(a), one that would trump many of the precise and careful substantive sections of the Code.... It is inconceivable that Congress intended to delegate such a core policy determination to the NAIC." *Id.* at 255, 109 S.Ct. at 2415.

In the instant case, the NAIC rules do not "trump" any substantive sections of the code or long-established accounting conventions. Further, the taxpayer's treatment of the policyholder dividends would be proper in a conventional coinsurance arrangement. Although there are important differences between conventional and modified coinsurance, none of them go to the "function and purpose" of the policyholder dividends or their reimbursement. Following the reasoning of *Colonial American Life*, therefore, it would be proper for the tax treatment of the dividends under a modified coinsurance arrangement to be the same as the tax treatment of the dividends under a conventional coinsurance arrangement.

The Seventh Circuit has addressed the scope of the applicability of the NAIC rules in light of *Standard Life* and *Colonial American Life:*

> The most natural reading of these cases is to defer to the NAIC on "accounting problems" and to ignore the NAIC on "core policy determinations." But it is difficult to tell which is which; for the issue in *Colonial Life* ... looks like an accounting problem to us.... The Annual Statement may not be definitive, but it is an authoritative interpretive guide to the meaning of the statute.

*Harco Holdings, Inc. v. United States*, 977 F.2d 1027, 1033 (1992).

## CONCLUSION

The court denies defendant's motion for summary judgment and grants plaintiff's cross-motion for summary judgment because, in the absence of contrary Code provisions, taxpayer's federal income tax reporting of reimbursements of policyholder dividends, consistent with NAIC rules, was proper. No costs.

The parties shall agree to the amount of plaintiff's damages, and shall file a stipulation of judgment with the court by March 15, 1996.